# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4257

_____

| | |
|---|---|
| Oliver C. Willis, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * Appeal from the United States |
| | * District Court for the |
| William J. Henderson, | * Western District of Arkansas |
| Postmaster General, United | * |
| States Postal Service, | * |
| | * |
| Appellee. | * |

_____

Submitted: November 15, 2000

Filed: August 21, 2001

_____

Before WOLLMAN, Chief Judge, and McMILLIAN and BYE, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Oliver Willis appeals from a final judgment entered in the United States District Court[1] for the Western District of Arkansas, following a bench trial finding that his former employer, the United States Postal Service ("Postal Service"), did not violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

_____

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

§ 2000e-2 et seq. (1994). See Willis v. Henderson, No. 99-4257 (W.D. Ark. Oct. 25, 1999) (memorandum opinion) ("slip op."). For reversal, Willis argues that the district court erred in holding that the Postal Service (1) did not subject him to a racially hostile work environment in violation of Title VII and (2) did not constructively discharge him from employment. For the reasons discussed below, we affirm the judgment of the district court.

Jurisdiction in the district court was proper based upon 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-2 et seq. Jurisdiction on appeal is proper based upon 28 U.S.C. § 1291. Willis filed a timely notice of appeal under Fed. R. App. P. 4(a).

## Background

On March 16, 1997, Willis filed an EEO complaint with his employer, the Postal Service, alleging racial discrimination. On May 27, 1997, the Postal Service dismissed Willis's complaint for failure to state a claim pursuant to 29 C.F.R. § 1614.107(a). Willis subsequently filed an appeal of the dismissal to the United States Equal Opportunity Employment Commission ("EEOC"). On August 27, 1998, the EEOC granted Willis the right to sue.

Willis filed suit in federal district court alleging that the Postal Service violated Title VII. Willis specifically alleged that he was subjected to a racially hostile work environment from the time of his original hire, through his alleged constructive discharge from the United States Post Office branch in Fayetteville, Arkansas ("Fayetteville post office"). The matter proceeded to trial. The following statement of facts is based on the evidence before the district court. We view the facts in the light most favorable to the judgment. See Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 352 (8th Cir. 1997).

Willis, an African-American, began his employment at the Fayetteville post office on September 4, 1993. Willis testified that, because he did not wish to move his family, he commuted over an hour each way to the Fayetteville post office from his home in Fort Smith, Arkansas, where he had been a life-long resident. At the Fayetteville post office, Willis was one of three African-Americans in a total workforce of about 200 to 300 employees.

Willis testified that, while working in his initial position as a part-time flex clerk, his supervisor criticized him for lacking familiarity with the duties of a clerk. In February 1994, Willis applied for a position operating a split position letter machine ("SPLM"). This position ultimately was given to a white employee who was more senior than Willis. When Willis questioned his supervisor about this appointment, the supervisor informed him that the more senior employee was better suited to the position. Willis did not pursue the matter further.

On March 5, 1994, Willis became a full-time employee and was assigned to the scuff belt, where he worked until accepting a level four machine automation job. Willis testified that, while working the machine automation job, and while on his way to and from breaks, co-workers walked by and, on occasion, made racist remarks, including, "[l]et's see if the monkey can run the machine," and "[l]et's see if he is smart enough to run the machine." Joint Appendix at 68-69 (Trial Tr.). Willis did not confront these co-workers nor report the remarks to his supervisor.

In the fall of 1994, Willis applied for and received a position as a level five distribution clerk, working a flat sorter machine. Wayne Tuck, a supervisor at the facility, assisted him in completing the application. Willis then went on to a priority mail position and, in 1995, was selected to serve as a temporary supervisor. While in this temporary supervisor position, Willis first came into contact with two white co-workers, Roy Smith and Mike Jarrell. Willis testified that Smith and Jarrell resisted his supervisory authority. Soon thereafter, from July to September 1995, Willis was asked

to work as a temporary supervisor at a United States Post Office branch in Fort Smith, Arkansas ("Fort Smith post office"). He subsequently applied for the permanent supervisor position at the Fort Smith post office, but that position was given to a white employee. Willis did not file a complaint nor make any further inquiry concerning any perceived discrimination in the hiring of the permanent supervisor at the Fort Smith post office.

Following his tour as a temporary supervisor in Fort Smith, Willis returned to the Fayetteville post office, where he worked in a priority mail position. He then applied for and was awarded, effective January 6, 1996, a position on the flat sorter machine. Soon thereafter, Smith and Jarrell began working in his area. Although Willis had a different shift and different days off, he still frequently worked with both Smith and Jarrell.

According to Willis's testimony Smith and Jarrell made offensive racial comments in his presence. Willis's white co-worker, Sherry Smith (unrelated to Roy Smith), confirmed this and testified that when she objected on behalf of Willis, Roy Smith and Jarrell would respond that "he knows we're only joking." Id. at 273. Sherry Smith further testified that Plant Manager Lee Thompson told Jarrell that he was not allowed to go into Roy Smith's work area. Another co-worker and shop steward, Loren Adams, testified that Smith and Jarrell called him a communist because he was active in the union. Willis further testified that Smith and Jarrell routinely bragged of their affiliation with the Ku Klux Klan and militia groups and of their ability to "get things done." Id. at 89.

Willis testified that he complained to Smith's and Jarrell's supervisor, Tuck, about their racially derogatory remarks, but that Tuck took no action. Willis also claimed that, in March 1996, he became so upset that he complained to his supervisor, Virginia Balekian, with tears in his eyes, about Smith's and Jarrell's racially derogatory remarks. According to Willis, Balekian told him to handle the situation better and took

no action. Willis further testified that he complained to the acting plant manager in the Fayetteville post office, Ted McClellan, an African-American, concerning Smith's and Jarrell's racially derogatory remarks, but that McClellan did nothing in response to his complaints. Willis also testified that he complained to James Hammonds, the Fayetteville Postmaster, concerning the racially derogatory remarks, that Hammonds said he would look into the matter, but that he took no action against Smith or Jarrell. Hammonds did not testify at trial.

At trial, Smith and Jarrell denied making any racially derogatory remarks to Willis. Terry Mullins, hired in the group with Willis, testified that he never heard any racially derogatory comments directed at Willis, but that he often heard Willis complain about the unfair treatment of African-Americans generally. Supervisors Tuck and Balekian denied that Willis ever complained to them regarding Smith's or Jarrell's racially derogatory remarks. McClellan similarly disputed Willis's account and testified that Willis never complained about specific behaviors or instances of racially derogatory slurs, and further stated that he took no action in response to what he viewed as Willis's general complaints on race issues.

Willis took a leave of absence from April 18-19, 1996, for personal reasons, and again from April 22-26, 1996, to help family members with a tornado disaster in Fort Smith. On May 2, 1996, Willis had a "formal discussion" with his supervisor concerning his attendance record.[2] He subsequently filed a grievance complaining that "he wasn't afforded the courtesy of an informal talk before given a formal discussion, as was afforded other employees." Id. at 518. Postal Service management agreed to Willis's request that the "formal discussion" be reduced to an "informal talk." Id.

---

[2]Article 16, Sec. 2, of the Agreement between the United States Postal Service and the American Postal Workers Union, AFL-CIO, provides that for minor offenses, "management has a responsibility to discuss such matters with the employee," that these discussions "be held in private," and that "such discussions are not considered discipline." Joint Appendix at 538.

Willis testified that by May 1996 he was suffering from headaches and ulcers and had sought professional help. The records of Willis's psychiatrist, Dr. Richard Mauroner, from June 6, 1996, reflect that five weeks earlier Willis was prescribed Prozac by another doctor. Dr. Mauroner's records of June 6, 1996, also reflect that Willis told the doctor that "the Post Office treats all [its] employees unfairly," but that Willis further said that he did "not feel that he particularly has been singled out for mistreatment." Id. at 772. Dr. Mauroner also reported on June 6, 1996, that Willis said he was experiencing marital problems, that a lifelong friend was recently murdered, and that he was experiencing difficulty sleeping, was very sad and had crying episodes. Dr. Mauroner further prescribed sleeping medication for Willis. See id. at 774. Willis then returned to work on about June 10, 1996.

Willis testified that on September 6, 1996, he was told by a co-worker that a letter, allegedly written by Tuck, was circulating in the post office describing him as "lazy, no good, and hard to get along with." Willis testified that two co-workers, Craig Lindsey and Loren Adams, informed him that they had seen the letter, although Willis admitted that he never saw the letter. Willis claimed that he then complained about the letter to supervisor Balekian, who subsequently questioned Tuck concerning the letter. Supervisor Balekian testified that Tuck told him that he did not create or circulate a letter criticizing or denigrating Willis. Co-workers Lindsey and Adams testified that they neither heard about the Tuck letter nor informed Willis of its existence. Co-worker Ken Ferrell admitted hearing rumors of the letter, but testified that he never actually saw the letter. The district court found that there was some evidence that the letter was circulated, but that supervisor Balekian took "appropriate action to remedy the situation." Slip op. at 25.

On September 16, 1996, Willis found a racist cartoon at his workstation.[3] Willis testified that, because he perceived this cartoon as a threat against himself, he showed it to both acting Plant Manager McClellan and Post Master Hammonds. Willis further testified that acting Plant Manager McClellan informed him this type of behavior would not be tolerated and that Post Master Hammonds stated he would check into the matter. McClellan testified that he recalled being told by Willis of the cartoon, but denied ever seeing it. McClellan further testified that he was under the impression that Willis had turned the matter over to Hammonds and admitted that he never discussed the racist cartoon with Hammonds. The record does not establish that either McClellan or Hammonds took any action regarding the racist cartoon.

Willis testified that he was so upset over the racist cartoon that he took a leave of absence beginning September 16, 1996, the day he found the cartoon, and did not return to work until October 22, 1996. On September 26, 1996, Willis formally requested EEO pre-complaint counseling, citing the alleged Tuck letter and the racist cartoon. In his request, Willis also alleged that two white, male co-workers were permitted to take breaks and come and go as they pleased while he was not and that such distinctions in treatment were due to race and favoritism. The record does not establish that formal action was taken pursuant to Willis's pre-complaint.

On October 8, 1996, Willis consulted a psychologist, Dr. Larry Withers, for treatment of depression. Dr. Withers's initial evaluation records reflect that Willis stated that he had been "significantly harassed during the past several years, . . . has commuted to and from Fayetteville to work," and that these factors "resulted in significant stress which . . . gradually [wore Willis] down." Id. at 732. Dr. Withers

_____

[3]The racist cartoon depicted a white male in robes, like those worn by the Ku Klux Klan, standing in front of the desk of an African-American whose name plate says "the boss." In the racist cartoon, the white man says "listen, we need more red-necks on the flat sorter. Now!!!" The African-American has a book on his desk entitled "EEOC GUIDELINES USPS." Joint Appendix at 600.

reported that Willis said that he had a lot of anger toward his "fellow employees and the administration and [felt] that he could be a threat provided the appropriate circumstances." Id. at 731. Dr. Withers concluded that Willis had employment problems and family conflict and that his symptoms "clearly meet the diagnosis of Major Depressive Disorder" and "significant anxiety." Id. at 732.

The district court's decision states that, once back at work, Willis's mental condition deteriorated to the point that Dr. Withers ordered him to take another leave of absence. See slip op. at 15. On December 12, 1996, Willis was voluntarily admitted to a hospital. Dr. Withers's records reflect that Willis had a lot of anger towards fellow employees and that Willis said "he could be a threat provided appropriate circumstances," that he "snaps at his family and curses at his supervisor," and that he was "depressed most all the time." Joint Appendix at 722. A report of psychological tests administered to Willis on December 18, 1996, indicates that Willis was suffering from chronic stress overload, that his perceptions of situations and his reality testing were frequently questionable, and that he showed signs of psychotic process, especially when angry. Willis tested positive for cocaine and marijuana while in the hospital. He was released from the hospital on December 19, 1996.

Willis testified that he made several unsuccessful attempts to return to work in April and May 1997, but that he did return to work in September 1997. At that time, Willis was assigned to a light duty shift from 7:00 a.m. to 3:30 p.m., instead of his regular hours. Dr. Withers's records further reflect Willis reported that, upon his return, the two co-workers who harassed him prior to his leave continued to harass him, that he had a high level of anxiety, and that "fellow employees look[ed] at him in a certain way or smil[ed] at him in a certain way that [made] him believe that they [were] making fun of him," and that he could not continue to work at the post office. Id. at 687, 689. Willis last worked at the Fayetteville post office on October 10, 1997. On October 20, 1997, after consulting with Dr. Withers, Dr. Mauroner wrote a letter stating that Willis should not return to work at the Fayetteville post office under any circumstance.

However, at trial Dr. Withers testified that, although it may not have been communicated in Dr. Mauroner's letter, he believed that as of October 1997, Willis could have gone to work at another Postal Service location. The Postal Service terminated Willis's employment by a letter received December 30, 1997.

Following a bench trial, the district court, in its detailed findings of fact, found that Smith and Jarrell were "equal opportunity harassers: picking on anyone whom they perceiv[ed] as different or as holding political or social views contrary to their own." Slip op. at 24. It further found that employees other than Willis found them "unpleasant and, therefore, "avoided them whenever possible." Id. The district court held that Willis failed to prove that a reasonable person who was the target of the alleged discrimination would have found the conduct and conditions so severe as to alter the terms and conditions of employment. See id. Although the district court found Willis's account credible and acknowledged the racially insensitive behavior exhibited by several of Willis's co-workers, the district court determined that Willis failed to prove that the Postal Service knew or should have known of the working conditions. See id. In this regard, the district court noted that it was incumbent upon Willis to use specificity in his complaints to supervisors. The district court also concluded that, although the behavior of co-workers contributed to Willis's inability to continue working, other events in Willis's life contributed as well, including the difficult and long daily commute from Fort Smith to Fayetteville; marital problems; illicit drug use; the tornado disaster that directly impacted Willis's family; the violent death of two of his friends; and the ordinary, but still present, stress of working at the post office generally, including the fact that Willis was one of only three African-Americans. See id. at 23. The district court further determined that Willis failed to prove that he received disparate treatment because of his race in matters of promotions, job assignments, and flexibility to take breaks, or that white employees received preferable treatment in these matters, noting that white employees similarly situated to Willis were treated the same. See id. at 26.

Addressing the racist cartoon, the district court acknowledged that the cartoon was extremely offensive, but held that the circumstances under which the racist cartoon appeared did "not indicate that it was meant to be a threat to [Willis's] safety or the safety of his family" and that when viewed objectively, the racist cartoon in itself was not sufficiently severe enough to alter the terms or conditions of Willis's employment. Id. The district court also found that no similar incidents occurred after Willis complained of the racist cartoon. See id.

The district court found that the Willis introduced no evidence that the Postal Service deliberately caused his working conditions to become objectively intolerable, nor was it foreseeable to the Postal Service that he would be unable to return to work because of a racially hostile environment. See id. at 27. Therefore, the district court held that Willis failed to show he was constructively discharged. See id. at 27. This appeal followed.

**Discussion**

Racially Hostile Work Environment

For reversal, Willis contends that the district court clearly erred in holding that (1) a reasonable person who was the target of the discrimination at the Postal Service would not have found the conduct so severe or pervasive as to alter the terms and conditions of employment, in violation of Title VII; (2) the racially derogatory remarks made by Willis's co-workers did not create a racially hostile work environment; and (3) even though Willis's claims of racially discriminatory conduct were credible, that such conduct was not sufficiently severe or pervasive as to prove a racially hostile work environment for the purposes of Title VII.

The district court's findings regarding the existence of a racially hostile work environment for the purposes of Title VII are findings of fact. See Anderson v. City

-10-

of Bessemer City, 470 U.S. 564, 573 (1985) (Anderson). A reviewing court shall not set aside findings of fact unless clearly erroneous. See id.; Sanders v. Alliance Home Health Care, Inc., 200 F.3d 1174, 1176 (8th Cir. 2000); Fed. R. Civ. P. 52(a). Under this standard, findings of fact will only be set aside when, if there is some evidence to support the findings, the reviewing court on the entire record is left with a "definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). This standard of review does not authorize a reviewing court to decide fact issues *de novo* nor does it allow the reviewing court to decide the better of two permissible views of the evidence. See id. at 573-74. Rather, under the clearly erroneous standard of review, a reviewing court must show deference to the original fact-finder if there was substantial evidence in the record to support the factual findings. See id.

To sustain a claim against an employer for a racially hostile work environment, a plaintiff is required to show: (1) he or she is a member of a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based upon race, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the racially discriminatory harassment and failed to take prompt and effective remedial measures to end the harassment. See Ross v. Nebraska, 234 F.3d 391, 395-96 (8th Cir. 2000) (citing Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998)).

There is no question that Willis, an African-American, is a member of a protected class, nor is there any question, as the district court properly found, that his co-workers subjected him to unwelcome harassment based upon his race. However, in order to prove a racially hostile work environment, in addition to proving that he was subjectively affected by the racially discriminatory behavior, Willis had to prove that the conduct of which he complained was sufficiently severe or pervasive as to create an *objectively* hostile work environment that altered the terms, conditions, or privileges of employment. See Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (Harris) (holding

-11-

that conduct not so severe as to "create an objectively hostile or abusive work environment . . . is beyond Title VII's purview"); White v. Honeywell, Inc., 141 F.3d 1270, 1275 (8th Cir. 1998) (White) (same).  The district court found that Willis failed to prove that his work environment was sufficiently hostile, such "that a reasonable person who was the target of the discrimination would have found the conduct so severe or pervasive as to alter the terms and conditions of employment."  Slip op. at 24.

Willis argues that the district court's finding that he subjectively believed that he was subjected to a racially abusive environment, is inconsistent with the district court's ultimate holding that he failed to prove that the offensive conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive." Harris, 510 U.S. at 21.  We disagree.

Upon considering whether a plaintiff has presented evidence of the objective component of a hostile work environment claim, the district court is required to look at all of the attendant circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  White, 141 F.3d at 1275 (quoting Harris, 510 U.S. at 23).  Given the factually conflicting accounts of Willis's experiences and the conditions of his workplace, the unverified existence of the Tuck letter, the lack of witnesses supporting Willis's account, and the other substantial non-work-related difficulties and problems that Willis was experiencing during his employment with the Postal Service, we conclude that the district court did not clearly err in finding that Willis's employment conditions, when viewed objectively, were not sufficiently severe or pervasive as to alter the terms, conditions, or privileges of Willis's employment.

On the record before us, we cannot say that the credibility determinations and findings of fact made by the district court, and upon which it relied in reaching its conclusions, are clearly erroneous. See Johnson v. Bunny Bread Co., 646 F.2d 1250, 1253-54 (8th Cir. 1981) (Johnson) (noting the district court's "superior position" from which to determine the witnesses' credibility and resolve conflicts in testimony); Bowers v. Kraft Foods Corp., 606 F.2d 816, 818 (8th Cir. 1979) (Bowers) (holding that courts "must give due regard to the opportunity of the district court to judge the credibility of the witnesses").

The Post Office's response to the cartoon found at Willis's workstation is troubling because of the seriousness of the cartoon's message to Willis. However, as the district court noted, there is no evidence that any other similar incidents occurred after Willis complained to acting Plant Manager McClellan and Post Master Hammonds about the cartoon. Furthermore, it appears from the record that Willis never returned to work for any substantial period of time following the cartoon incident. Based on the record before us, and the district court's findings of fact tending to show that racially discriminatory behavior rising to that level had ceased and Willis never meaningfully returned to work following the incident, we cannot say that the district court was clearly erroneous in holding that no racially hostile work environment for the purposes of Title VII existed. See Brooks v. San Mateo, 229 F.3d 917, 925-27 (9th Cir. 2000) (finding that a single instance of "highly offensive" workplace harassment did not create a hostile work environment for the purposes of Title VII because the isolated incident did not alter the terms and conditions of employment).[4]

---

[4]Although we hold in the present case the single incident involving the racist cartoon did not create a hostile work environment, there may be circumstances under which a single incident creates a hostile work environment in violation of Title VII. Indeed, "we are unaware of any rule of law holding that a single incident can never be sufficiently severe" to create such an environment. Moring v. Arkansas Dep't of Corr., 243 F.3d 452, 456 (8th Cir. 2000).

We further note that while Willis was subjected to unpleasant conduct and rude comments by Smith and Jarrell, as were other employees, Title VII is "not designed to create a federal remedy for all offensive language and conduct in the workplace" nor can we, under the auspices of Title VII, "impose a code of workplace civility." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999).

Constructive Discharge

Willis next argues that the district court clearly erred in finding that he was constructively discharged from his employment. To successfully state a claim for constructive discharge, a plaintiff must prove that his or her "employer intentionally render[ed] the working conditions so intolerable'" that the plaintiff was "essentially forced to leave the employment." White, 141 F.3d at 1279 (citing Bradford v. Norfolk S. Corp., 54 F.3d 1412, 1420 (8th Cir. 1995)); see also Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494-95 (8th Cir. 1996) (Tidwell). Willis must demonstrate "more than just a Title VII violation by [his] employer in order to prove that [he] was constructively discharged." Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998) (Coffman). Willis is required to prove that the Postal Service "deliberately creat[ed] intolerable working conditions with the intention of forcing [him] to quit" and that "a reasonable person in [his] situation would find the working conditions intolerable. Thus, the intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings." Id. (citing Tidwell, 93 F.3d at 494). Willis may "satisfy the intent element by demonstrating that he quit as a reasonably foreseeable consequence of the employer's discriminatory actions." Tidwell, 93 F.3d at 494 (citing Hukkanen v. International Union of Operating Eng'rs, 3 F.3d 281, 285 (8th Cir. 1993)). Moreover, Willis is required to prove that the Postal Service knew or should have known of the alleged harassment, because "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." Id. (citing West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995)); see also Coffman, 141 F.3d at 1247.

-14-

The district court credited the testimony of Willis's supervisors that, although Willis complained generally to them, he never made specific complaints except on the occasion of the Tuck letter.   As to the Tuck letter, the district court found the Postal Service immediately investigated and adequately responded to Willis's complaint.  The district court further found that Willis failed to prove that the Postal Service knew or should have known of the harassment by Smith and Jarrell and that the Postal Service failed to take prompt and remedial action in this regard.  Additionally, the district court found that Willis never made specific complaints about offensive conduct by co-workers.  The district court also found that there was no evidence to support a finding that the Postal Service "deliberately caused [Willis's] working conditions to become objectively intolerable, thereby forcing him 'out of service.'"  Slip op. at 28.  The district court further found that there was not sufficient evidence "from which [it could] conclude it was reasonably foreseeable that [Willis] would be unable to return to work because of the racially hostile atmosphere of the workplace."  Id.   Therefore, the district court held that Willis failed to show that he was constructively discharged by the Postal Service.

Based on the record before us, we cannot say that the credibility determinations and findings of fact of the district court regarding Willis's constructive discharge claim are clearly erroneous.  See Johnson, 646 F.2d at 1253-54; Bowers, 606 F.2d  at 818.  There was no evidence that the Postal Service deliberately caused his working conditions to become objectively intolerable, nor was there any evidence that such a condition was reasonably foreseeable.  Therefore, we agree with the district court that Willis failed to prove that he was constructively discharged.  See Coffman, 141 F.3d at 1247-48;  Tidwell, 93 F.3d at 494.

## Conclusion

For the reasons stated above, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.