# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1186/1188

_____

| | | |
|---|---|---|
| Dennis Larson, a Minnesota resident, | * | |
| | * | |
| Appellant/Cross-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Granite Re, Inc., | * | |
| | * | |
| Appellee/Cross-Appellant. | * | |

_____

Submitted: January 18, 2008
Filed: July 7, 2008

_____

Before COLLOTON and SHEPHERD, Circuit Judges, and GOLDBERG,[1] Judge.

_____

SHEPHERD, Circuit Judge.

Strom Construction ("Strom")[2] asserts multiple claims against Granite Re,

_____

[1]The Honorable Richard W. Goldberg, United States Court of International Trade, sitting by designation.

[2]Dennis Larson and Strom entered into a Claims Liquidation and Prosecution Agreement pursuant to which Larson agreed to prosecute Strom's claims, along with his own claims, against Gerald Martin, the payment bond principal, and Granite Re, the payment bond issuer. Per that agreement, if Larson settled his own claims not Strom's, Strom would prosecute its own claims albeit in Larson's name. While this litigation was pending, Larson settled his claims with Granite, and Strom undertook the prosecution of its own claims, in Larson's name.

Inc.'s ("Granite's") payment bond.  The parties appeal and cross-appeal the district court's[3] judgment.  We affirm.

I.

The following statement of facts is based on the evidence before the district court. We view the facts in the light most favorable to the judgment.  Willis v. Henderson, 262 F.3d 801, 803 (8th Cir. 2001).  This case arises out of a multi-million dollar road construction project (the "Project") at Turtle Mountain Indian Reservation near Belcourt, North Dakota.  The Chippewa Band of Indians (the "Tribe") served as the prime contractor on the Project.  Prior to the execution of the prime contract between the Tribe and the Bureau of Indian Affairs (the "BIA"), the Tribe and Gerald Martin, a member of the Tribe, entered into negotiations for Martin to serve as the main subcontractor for the Project.  Martin was a small contractor with very limited road construction experience and no established line of bond credit.  By all accounts, Martin lacked the requisite equipment, working capital, experience, and qualifications to undertake the Project.

Anticipating a need for subcontract payment and performance bonds relating to the Project, Martin contacted Goldleaf Financial, Ltd. ("Goldleaf") in 2001.  Goldleaf's business was to help small companies obtain surety credit by providing a limited guarantee to the surety.  Martin's contact was Goldleaf's president, Dennis Larson.  Goldleaf had engaged in a number of transactions with Jonathan Pate, owner of the Pate Agency.  Jonathan Pate was a bond agent for a number of specialty sureties that wrote smaller bonds for smaller contractors.  One of those sureties was Granite, which Pate owned in part.  During the spring of 2002, Goldleaf referred Martin to Pate in an effort to obtain bonding for Martin.

---

[3]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

Goldleaf, largely through Larson, collected background and financial information concerning the Project and Martin. Larson went to Belcourt to gather information on Martin, and, though he discovered that Martin did not have the requisite equipment, working capital, or experience to complete the Project, Larson believed that Martin could complete the Project with assistance. Larson sent information to Granite regarding Martin and the Project with a request that payment and performance bonds be issued for Martin. In order to induce Granite to issue the bonds, Goldleaf provided a limited (15%) guarantee on the bonds and offered to set up an escrow account on the Project to assure control of the Project funds.[4]

In late February or early March 2002, Martin met with BIA representatives to discuss the Project. Around that time, Larson offered his services to Martin both as a subcontractor for moving dirt, the largest part of the work making up the Project, and as a supplier of heavy equipment. On March 8, 2002, Martin and Larson entered into a subcontract in which Larson agreed to perform the dirt moving work on the Project.[5] At that time, Larson knew that no prime contract was in place between the BIA and the Tribe and no subcontract had been executed between the Tribe and Martin.

---

[4]The escrow account was handled by Goldleaf Escrow, a sister company to Goldleaf Financial that Larson also owned in part. Goldleaf Escrow entered into an agreement with the Tribe. Per the agreement, the Tribe would place the funds it received from the BIA in escrow, and Goldleaf Escrow would be responsible for paying subcontractors on the Project out of those funds.

[5]The agreement provided that Larson would move clay and dirt on the Project for $0.95 per loose cubic yard and that the "[p]rice [was] based on three scrapers being on-site, moving clay or dirt for the entire duration of all six contracts [anticipated between Martin and the Tribe] (5.9 miles)." Appellant's Appendix at 1. The agreement does not address compensation for idle equipment or operators and does not contain any specifications as to the distance the dirt was to be moved.

In March 2002, Paul Strom, of Strom Construction, verbally agreed with Larson to supply scrapers and operators to complete the dirt moving work that Larson had subcontracted to perform for Martin. Larson agreed to pay Strom $0.76 per cubic yard of loose dirt. According to Strom, this amount was based on Strom performing short haul work, that is moving dirt distances of one-half mile or less. Larson and Strom did not agree to a start date.

On March 15, 2002, the BIA awarded a $5,229,788.40 prime contract to the Tribe for the Project; however, the Tribe and Martin did not enter into a subcontract at that time. Work on the Project was to begin in May 2002, after the spring thaw. North Dakota imposes restrictions on the weight of vehicles that can drive on the state's highways during the spring thaw, so there is a period of time every year (usually April and May) when heavy construction equipment cannot be transported. A BIA official contacted Larson and told him to move forward in mobilizing the heavy equipment to the Project site before the road restrictions were in place, so the equipment would be on-site and available as soon as the BIA issued a notice to proceed. According to Larson, the official made the same statement to Martin. Larson then called Strom and directed him to mobilize his equipment. Based on his discussions with Martin and Larson, Paul Strom understood that work on the Project would begin on May 6, 2002. Strom's equipment, consisting of three scrapers, was mobilized to the site in March 2002. At that time, Larson knew that there was no contract in force between Martin and the Tribe and that no payment or performance bonds were in force.

Disputes arose among the BIA, the Tribe, and Granite regarding the contracts and the bonds. On April 9, 2002, the Tribe and Martin attempted to enter into a subcontract worth of $886,404.81, one-sixth of the total Project. On April 26, 2002, Granite faxed a copy of the proposed subcontract bonds in the sum of $886,404.81 to Larson at Goldleaf. However, the BIA deemed the subcontract unacceptable and refused to agree to it. Larson was aware of the BIA's rejection of the purported

-4-

subcontract. The original bond documents, which were never signed by Martin, were never released from Granite's possession and were voided internally by Granite. Strom's equipment remained idle at the Project site from April to June of 2002.

In July, the resolution of the contract and bonding issues between the BIA and the Tribe appeared to be at hand, and Martin directed Larson to have Strom mobilize his equipment operators to the Project site. At that time, there was still no subcontract in force between Martin and the Tribe. Both Larson and Strom were aware of this. Three of Strom's operators and Strom's foreman, Brad Barry, arrived at the site on July 15, 2002. Once Strom's equipment operators arrived at the Project site, Strom paid them for 12 hours per day, even though they were unable to begin work.

The BIA and the Tribe eventually agreed to divide the Project into three phases under three separate contracts. The first phase ("Phase I") would involve 1.5 to 2 miles of road construction. On July 23, 2002, the Tribe and Martin executed a written subcontract for Phase I (the "Tribe/Martin subcontract") in the amount of $1,696,588.39. That same day, Granite executed and issued payment and performance bonds in the sum of $1,696,588.39, naming Martin as bond principal and the Tribe as bond obligee. Jonathan Pate signed the bonds on behalf of Granite.

Pate testified that Granite performed no additional investigation as to Martin between the preparation of the April bonds and the issuance of the July bonds. Pate further stated that Granite was not aware that Strom's equipment and operators were at the Project site prior to the bonds' issuance and that if Granite had known of potential outstanding claims at that time, it would not have issued the bonds. Pate also stated that, prior to issuance, he had no discussions with Martin, the Tribe, the BIA, or Strom. At that point, Pate had only discussed the Project with Larson and individuals associated with Goldleaf and was unaware that Larson was a subcontractor on the Project. Pate testified that Larson had a conflict of interest in that he served as: (1) bond agent, helping Martin to obtain the bond; (2) escrow agent, controlling the

finances on the Project; and (3) subcontractor such that there was a possibility that he would have claims against the bond.

On July 30, 2002, the BIA issued a notice to proceed, and Strom's employees began work on the Project that day. When the work started, it became apparent that none of Martin's workers possessed the requisite experience or knowledge required to serve as the Project Superintendent, planning and supervising the overall construction of the Project. Strom's foreman, Barry, filled this role. There was no written agreement between any of the parties–Martin, Larson, or Strom–as to an increase in Barry's wage corresponding to the increase in duties. According to Barry, he, Larson, and Paul Strom met to discuss Barry serving as supervisor, and Larson and Paul agreed to pay Barry a higher wage.

At the outset of Phase I, an issue arose regarding the necessity of moving dirt distances greater than one-half mile. Strom had submitted its bid with the understanding that it would perform short haul work, moving dirt distances less than one-half mile, and that Martin would perform the long haul work, moving dirt distances in excess of one-half mile. However, the BIA, due to concerns over excessive erosion and potential environmental problems, prohibited Martin from opening up more than 350,000 square feet of the Project at any given time. The import of the BIA prohibition was that the long haul and short haul work could not take place concurrently. Martin opted to proceed with the long haul work.

Strom offered to use his scrapers to help Martin for an additional $0.41 per cubic yard. This increase stemmed from the fact that Strom would be moving dirt a greater distance than that included in its original bid which would lengthen Strom's travel time and, ultimately, lessen the total cubic yards of loose dirt Strom could move (the measure by which Strom was to be paid). There is no written agreement between any of the parties regarding the increased price for Strom's dirt moving work over that specified in Strom's original bid. Larson orally agreed to pay Strom the increase, and,

according to Larson, he told Martin that Strom expected for Martin to pay for the long haul work and Martin did not object. Strom engaged in long haul work during Phase I of the Project from August 2, 2002 to October 7, 2002, moving 179,852 cubic yards of loose dirt. In October 2003, Martin wrote Larson that he would not pay for the increased cost of Strom performing long haul work during Phase II of the Project. At that time, Larson informed Strom that he would not pay Strom for the long haul work absent Martin's agreement.

After the Project was completed, Larson and Strom had several unpaid claims. Strom's claims were for: (1) idle equipment from May 9, 2002 to July 15, 2002; (2) idle equipment/operators from July 15, 2002 to July 30, 2002; (3) Barry's compensation for acting as Project supervisor; and (4) the long haul work. Larson made a claim against the Granite payment bond for the amount that he claimed was owed to him and also for the amount which Strom claimed against Larson. When Larson's claim on the bond was not paid, he brought suit against Granite. While the litigation was pending, Martin filed bankruptcy. Larson settled its claims against Granite, but Strom's claims were not settled. Pursuant to the Claims Liquidation and Prosecution Agreement, Strom pursued its own claims, in Larson's name, against Granite. Per the agreement, Strom cannot seek recovery from Larson in excess of what Larson recovered from Martin and Granite on Strom's behalf.

After a bench trial, the district court determined that: (1) before a surety may be held liable on a contract, a contract must exist to delineate the scope of the surety's obligations; (2) Granite's July 23, 2002 payment and performance bonds bonded the Tribe/Martin subcontract as of that same date; and (3) it is from that date that Granite assumed liability under the Tribe/Martin subcontract. Accordingly, the district court found that Granite was not liable for Strom's idle equipment claim or the idle equipment/operator claim. The district court further found that the supervisor and long haul claims were covered by the bond because they involve labor used or reasonably required for use in the performance of the Tribe/Martin subcontract. The

district court determined that Martin owed: (1) $14,000 for his share of the settlement that Larson entered into with Strom on the supervisor compensation claim and (2) $70,049.32 on the long haul claim. Therefore, the district court awarded Larson $84,049.32 for the benefit of Strom Construction. Both parties appealed, Strom seeks reversal on its idle equipment and idle equipment/operators claims, and Martin seeks reversal on the supervisory compensation and long haul claims.

## II.

On an appeal from a bench trial, we review the district court's fact finding for clear error, and we review legal conclusions de novo. Eckert v. Titan Tire Corp., 514 F.3d 801, 804 (8th Cir. 2008). We apply North Dakota substantive law in this diversity action. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Immigration Law Group, LLP v. McKitrick, 484 F.3d 998, 1001 (8th Cir. 2007).

## III.

Because "[a] surety cannot be held beyond the express terms of the surety's contract . . ." under North Dakota law, this appeal turns on the payment bond's language. N.D. Cent. Code § 22-03-03 (2002). Granite's July 23, 2002 payment bond, by its terms, bonded "Project No. 6-40(3) - Contract No. A0025020202 - Martin Lake Road, Route 6, Turtle Mountain Chippewa Indian Reservation, Belcourt, North Dakota" for "labor, material, or both, used or reasonably required for use in the performance of" the Project. The plain language of the bond provides that it covers all labor and materials used or reasonably required for use in the performance of the Tribe/Martin subcontract. See N.D. Cent. Code § 9-07-09 (2006); Burlington N. & Sante Fe Ry. Co. v. Burlington Res. Oil and Gas Co., 590 N.W.2d 433, 438 (N.D. 1999); Moen v. Meidinger, 547 N.W.2d 544, 547 (N.D. 1996).

In determining whether the claims at issue are recoverable against the payment bond, we categorize the claims into three time periods: (1) pre-July 23, 2002; (2) July 23, 2002 to July 30, 2002; and (3) post-July 30, 2002.

## A. Pre-July 23, 2002 Claims

We first consider those claims that arose prior to July 23, 2002, representing a portion of Strom's idle equipment and worker claims. These claims preceded both the Tribe/Martin subcontract and the payment bond, both of which were executed on July 23, 2002. Though the parties offered no North Dakota precedent on this point and we found none, it is non-controversial that a bond may be applied to costs incurred prior to its issuance where no default occurred prior to the issuance. See Reed v. Maryland Cas. Co., 244 F.2d 857, 862-63 (5th Cir. 1957) (per curiam); see also Leonard C. Carnaghi, Inc. v. Amwest Sur. Ins. Co., 617 N.W.2d 49, 52-53 (Mich. Ct. App. 2000); Iowa Concrete Breaking Corp. v. Jewat Trucking, Inc., 444 N.W.2d 865, 868 (Minn. Ct. App. 1989); Parliament Ins. Co. v. L.B. Foster Co., 533 S.W.2d 43, 50-51 (Tex. Ct. App. 1975). Thus, the pre-bond nature of the claims does not, in and of itself, disqualify them from being recoverable against the bond. However, these claims are also pre-contract. Accordingly, the question here is: are claims recoverable against a bond that arise prior to the contract guaranteed by the bond?

Jonathan Pate testified that, though it is commonplace for a surety to issue a bond on a project, even though work has already begun, bond issuance never predates the execution of the underlying contract. According to Pate, though bonds can cover claims for work performed before the bond was issued, a surety cannot issue a bond before the underlying contract is executed because before that contract is in place there is nothing to bond. We have found no cases addressing the pre-contract, pre-bond period nor have we located a case allowing recovery against a bond for claims arising both pre-contract and pre-bond. Iowa Concrete expressly indicates that the contract that was eventually bonded was already in place when the work was

performed.  See 444 N.W.2d at 866-67.  In Leonard C. Carnaghi, the contract referenced in the bond incorporated a prior contract that was in place when the work was performed that specifically authorized the work.  617 N.W.2d at 50, 53.  The Reed Court refers to both the "partially executed subcontracts before the bond was executed and delivered" and "the advanced state of execution of the contract it was guaranteeing."  244 F.2d at 862.  The Parliament Ins. Co. Court, observed:

> It has been held that, where the bond of the subcontractor inures to the benefit of the laborers and materialmen, it is immaterial if some of the materials were furnished to the principal contractor prior to the execution of the bond, so long as such labor and materials *were used in the performance of the work which was covered by the subcontract.*

533 S.W.2d at 50 (citing Reed, 244 F.2d 857) (emphasis added).  Thus, Parliament Ins. Co. indicates not only the that a contract pre-existed the issuance of the bond, but that, if that had not been the case, the bond would not have provided coverage for the pre-contract, pre-bond work.

Accordingly, there is a material distinction between this case and the aforementioned cases, the existence of a contract covering the work performed during the pre-bond period.  In our view, it defies logic that the bond's guarantee of the July 23, 2002 subcontract could be stretched to cover costs incurred prior to the subcontract's existence where the bond did not incorporate prior activity or any other pre-existing contracts.  Accordingly, we affirm the district court's finding that none of Strom's claim arising before July 23, 2002 may be recovered against the Granite bond.

### B.  Claims arising from July 23, 2002 to July 30, 2002

Claims arising during this period represent a portion of the idle equipment/operators claim which the district court denied.  Unlike the claims

-10-

discussed in the preceding section, these claims arose post-contract and post-bond. However, these claims arose prior to July 30, 2002, when the BIA issued the Notice to Proceed on the Tribe/Martin subcontract, and Strom began working on the Project. As the payment bond states, Granite guaranteed all "labor, material, or both, used or reasonably required for use in the performance of the [the Tribe/Martin subcontract]." Although the district court did not consider the claims for idle equipment/operators for these six days in isolation, but rather only the idle equipment/operators claim as a whole, it found that no work pursuant to the contract occurred prior to July 30, 2002. Were we considering these claims in the first instance, we might find otherwise because the contract was in place, the bond was issued, and the equipment and operators, though idle, were present on the Project site at the behest of Martin, the bond principal. Nonetheless, the district court's finding does not amount to clear error. See United States v. Massey, 462 F.3d 843, 846 (8th Cir. 2006) (under the clear error standard, "even if a reasonable person could find to the contrary, we may reverse 'only if we have a definite and firm conviction that the District Court was mistaken'" (quoting United States v. Bahena, 223 F.3d 797, 802 (8th Cir. 2000)).

## C. Post-July 30, 2002 Claims

We now address the portion of Strom's claims that the district court found were recoverable against the bond, the supervisor compensation and long haul claims, focusing again on the language of the bond. See N.D. Cent. Code § 22-03-03. These claims arose in the post-contract, post-bond period. Again, the bond covers all "labor, material, or both, used or reasonably required for use in the performance of the contract . . . ." Thus, Granite is liable for the long haul and supervisory claims if the underlying work was used or reasonably required for use in the performance of the subcontract. See N.D. Cent. Code § 9-07-09. It is undisputed that the claims for long haul movement of dirt and supervisor Barry's time arose out of Strom's work on the Project.

-11-

However, Granite contends that Strom's charges for long haul costs, although perhaps recoverable against Larson under the subcontract between Strom and Larson, are not recoverable against Martin or Granite. Granite bases this argument on the fact that Larson's contract with Martin provided no specifications as to hauling distances, specifying only that Larson was entitled to $0.95 cents per loose cubic yard of dirt moved. The district court observed that, "[b]ecause Strom bid the scraper work on the basis of shorter hauls . . . , Strom announced that he would need an additional 41¢ per cubic yard for the long hauls" and found that "Martin apparently agreed in that arrangement."

Granite has offered nothing to contradict this factual finding, and we find no clear error. See Massey, 462 F.3d at 846. The facts establish that Martin was aware of Strom's demand for additional compensation to engage in long haul work, that Strom engaged in long haul work, and that Martin was on the Project site and aware of Strom engaging in such work. This coupled with Martin's refusal to pay the increased cost of Strom performing long haul work during Phase II of the Project and Larson's statement to Strom that Larson would not cover such costs absent Martin's approval further demonstrates that it was indeed Martin who made the call during Phase I that Strom was to engage in long haul work for additional compensation. There was no testimony that Martin made any similar objection to Strom performing long haul work performed by Strom during Phase I. Thus, the additional long haul costs indicates that the cost was in furtherance of the Tribe/Martin subcontract which the bond secured.

Granite also asserts that Larson was a joint venturer with Martin and thus is afforded no protection by the payment bond. It is well-established that a bond claimant who is a joint venturer with the bonded principal cannot recover under a

Miller Act[6] payment bond. United States ex. rel. Woodington Elec. Co., Inc. v. United Pac. Ins. Co., 545 F.2d 1381, 1382 (4th Cir. 1976). However, this rule does not bar Strom's recovery on the payment bond for the long haul and supervisor claims for two reasons. First, in this case, the bond claimant is Strom Construction, not Larson. Granite has not offered any evidence that Strom Construction was a joint venturer with Martin or authority for the proposition that Strom, by virtue of being the subcontractor of a joint venturer with Martin is precluded from recovering under the bond. Second, the payment bond at issue here is not a Miller Act bond and, thus, the circumstances under which a joint venturer may be precluded from claiming under a surety bond are governed by state law rather than cases applying the Miller Act. See Toporoff Eng'rs, P.C. v. Fireman's Fund Ins. Co., 371 F.3d 105, 109 n.1 (2d Cir. 2004). Granite offered no authority describing the circumstances under which a joint venturer may be precluded from claiming under a surety payment bond under North Dakota law.

Granite next contends that the doctrine of equitable estoppel applies here due to Larson's improper actions, barring Strom's recovery of the long haul and supervisor costs. Although North Dakota recognizes the doctrine, N.D. Cent. Code § 31-11-06 (1996), and the district court was clearly troubled by Larson's conduct, equitable estoppel is inapplicable here. Rather, the doctrine is meant "to prevent inequities that may result when an agreement is void or unenforceable because of inadequate consideration or the statute of frauds and one of the parties has acted to his detriment because of a representation or promise made by the other person." O'Connell v. Entm't Enters., Inc., 317 N.W.2d 385, 389 (N.D. 1982). In other words, it is applied in instances where there is a defective contract between the parties but fairness dictates that the agreement be enforced, a principle irrelevant to this appeal.

---

[6]The Miller Act, 40 U.S.C. §§ 3131-3134, requires a government contractor to furnish performance and payments bonds with surety "for the protection of all persons supplying labor and material" for projects over $100,000. 40 U.S.C. § 3131(b)(2).

Finally, Granite contends that the Restatement bars recovery for the long haul and supervisor claims because a surety can avoid liability based on the failure of an obligee to disclose material facts. While the Restatement does provide that a secondary obligation is voidable due to fraudulent or material misrepresentation by the obligee that induces the secondary obligor to enter into the secondary obligation, Restatement (Third) of Suretyship and Guaranty § 12, here, the payment bond expressly provides that the Tribe, not Larson, is the bond obligee. Thus, the plain language of the bond defeats Granite's argument. In sum, the district court properly determined that Strom was entitled to recover for claims for supervisor time as well as claims for long haul work incurred by Strom after July 30, 2003.

IV.

The judgment of the district court is affirmed.

_____