**Debra M. CANADY, Plaintiff,**

v.

**JOHN MORRELL & CO., a Delaware Corporation, Defendant.**

**No. C 01–4086–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

March 3, 2003.

Stanley E. Munger, Jay Elliott Denne, Munger, Reinschmidt & Denne, Sioux City, IA, for plaintiff.

Melanie L. Carpenter, Gary P. Thimsen, Woods, Fuller, Shultz & Smith, PC, Sioux Falls, SD, Scott C. Folkers, Scott Folkers Law Firm, Sioux Falls, SD, Leslie R. Stellman, pro hac vice, Barry Bach, Hodes, Ulman, Pessin & Katz, PA, Towson, MD, for defendant

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *BACKGROUND* ...................................................1109

A. Procedural Background ............................................1109
B. Factual Background ..............................................1110

II. LEGAL ANALYSIS ....................................................1112
A. Standards For Summary Judgment ................................1112
B. Canady's Harassment Claims......................................1113
 1. Arguments of the parties .....................................1113
 2. Sufficiency of the alleged harassment ........................1115
 a. Based on sex or race .....................................1116
 i. Canady's purported admissions of the lack of animus ........1116
 ii. Animus in gender- and race-neutral incidents ..............1117
 iii. Gender-based comments and conduct ........................1118
 iv. Race-based comments and conduct ..........................1119
 v. Looking for the "tie." ....................................1119
 b. Affecting a term or condition of employment ....................1121
 3. Employer liability ...........................................1123
 a. What is sufficient to put an employer on notice? ..................1123
 b. Was there sufficient notice in this case?..........................1124
 i. Constructive notice from circumstances......................1124
 ii. Express indications that discrimination was afoot...........1125
 iii. "Arguable" indications that discrimination was afoot ......1126
 c. John Morrell's response to reports of harassment .................1128
C. Retaliation ......................................................1129
 1. Arguments of the parties .....................................1129
 2. Canady's showing in support of her retaliation claim.................1129
 a. Protected activity .........................................1130
 b. Adverse employment action ..................................1130
 c. Causal connection .........................................1131

III. CONCLUSION ......................................................1131

In another in a series of recent lawsuits against defendant John Morrell & Co., which operates a meat packing plant in Sioux City, Iowa, plaintiff Debra Canady, an African–American female, asserts claims of racial and sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964. Once again, on John Morrell's motion for summary judgment, the key issue in the case is not whether the plaintiff was "harassed." Key issues are, instead, whether the "harassment" was because of a protected characteristic, whether the "harassment" in question was sufficiently severe and pervasive to be actionable, and whether John Morrell knew or should have known that the "harassment" was because of a protected characteristic. Because this lawsuit is one in a series against the same defendant, and involves issues similar to those in some of the other cases in the series, comparisons are inevitable, but the case must be judged on its own merits. To put it another way, the question is, what, if any, unique "spin" is presented by the claims and the record in this particular case?

## I. BACKGROUND

### A. Procedural Background

In this action pursuant to Title VII of the Civil Rights Act of 1964, filed August 13, 2001, plaintiff Debra Canady asserts the following claims against her former employer, defendant John Morrell & Co.: (1) hostile environment sexual harassment; (2) hostile environment racial harassment; and (3) retaliation for complaining about sexual and racial harassment. This matter is set for trial to begin on April 14, 2003. At the time that John Morrell filed its motion for summary judgment in this case, on December 16, 2002, the motion ad-

dressed all of Canady's claims, and therefore, could have obviated the need for any trial. However, on February 25, 2003, Canady was granted leave to amend her complaint to add claims pursuant to 42 U.S.C. § 1981 and the Iowa Civil Rights Act (ICRA), as well as Title VII. Thus, even if granted in its entirety, John Morrell's motion for summary judgment would not fully dispose of this action.

Canady resisted John Morrell's motion for summary judgment on her original Title VII claims on January 17, 2003, and John Morrell filed a reply in further support of its motion on February 3, 2003. The court heard the parties' oral arguments on John Morrell's motion for summary judgment on February 20, 2003. At the oral arguments, plaintiff Debra Canady was represented by Jay E. Denne of Munger, Reinschmidt & Denne, L.L.P., in Sioux City, Iowa. Defendant John Morrell & Co. was represented by Leslie Robert Stellman of Hodes, Ulman, Pessin & Katz, P.A., in Towson, Maryland. John Morrell's motion for summary judgment is now fully submitted.[1]

### B. Factual Background

Although whether or not a party is entitled to summary judgment ordinarily turns on whether or not there are genuine issues of material fact for trial, see, e.g., Quick v. Donaldson Co., 90 F.3d 1372, 1376–77 (8th Cir.1996), the court will not attempt here a comprehensive review of the undisputed and disputed facts in the record. Rather, the court will present here only sufficient

factual background to put in context the parties' arguments for and against summary judgment on Canady's claims. More attention will be given to specific factual disputes, where necessary, in the court's legal analysis.

Canady, an African–American female, has been employed by John Morrell since 1991. At the times relevant to her complaint, she worked on the "cut floor," boxing different cuts of meat, and weighing and stamping the boxes. She contends that, from about 1998 through the end of her employment with John Morrell in 2001—and, indeed, earlier—she was sexually and racially harassed by various co-workers, but she acknowledges that none of the harassment was by supervisory personnel.

More specifically, Canady points to evidence that, on various occasions, she was subjected to offensive epithets, including "nigger," "monkey," "bitch," and "fat ass," primarily from white and Hispanic males, although she acknowledges that some of the comments came from other female employees. She also alleges that when female employees used lip balm or ate bananas or hot dogs, male co-workers would make sexually suggestive comments. She also asserts that, when she would bend over in the course of her duties, male employees would make sexually suggestive comments or throw items, including pieces of meat, at her buttocks.

1. On February 20, 2003, Canady filed a Motion For Leave To File Supplemental Evidence In Support Of Plaintiff's Resistance To Defendant's Motion For Summary Judgment. In that motion, Canady seeks to supplement the present summary judgment record with excerpts of her testimony at the trial in another matter, *Baker v. John Morrell & Co.*, 220 F.Supp.2d 1000 (N.D.Iowa 2002). John Morrell resisted the motion on February 25, 2003, primarily on the ground that the testimony

from trial in a different matter was not proper material to include in a resistance to summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure, because it was not *already* part of the record in this case. The court has not considered Canady's proffered supplemental evidence in disposing of John Morrell's motion for summary judgment. Therefore, Canady's motion to supplement the summary judgment record will be denied as moot by separate order.

Canady points to evidence of still more specific incidents of alleged sexual and racial harassment. She alleges that a co-worker, Edwardo Labarredo, routinely physically harassed her on the line and that managerial personnel accused them both of causing the conflict. John Morrell contends, and Canady does not specifically dispute, that after frequent meetings involving Labarredo, Canady, and John Morrell managerial personnel, Labarredo and Canady were each given an "ultimatum" to stop their conflicts, and that they were eventually assigned to separate work areas to prevent further conflicts. The parties agree that Labarredo was eventually fired. John Morrell asserts that Labarredo's termination was, at least in part, because of his conflicts with Canady, although John Morrell acknowledges that the primary reason that Labarredo was fired was that he made a false injury report. The parties agree that Labarredo was fired *in 1997*, which precedes the period of harassment ·identified in Canady's complaint, and may precede the period for which any relief might be available under Title VII.

Canady also alleges that, within a one-week period, she was "kicked in the butt" by Kim Henshaw, a Native American co-worker, and that a Hispanic male twisted a plastic barrel out of her hands in a manner that she found threatening. When Canady found the response of managerial personnel to her complaints about these two incidents to be inadequate, she became so upset that she called the police to the plant to report the "assaults."

Canady also recounts an incident in August of 2000 when a female supervisor, Connie Mitchell, began swearing at her, apparently because Canady refused to follow a job directive issued by Mitchell. Mitchell was not Canady's direct supervisor and Canady contends that she refused to follow Mitchell's directive for that rea-

son. The record reflects that Canady began swearing back at Mitchell, and that Canady was later disciplined for her conduct and for failure to follow Mitchell's directive. Similarly, Canady alleges that another female quality control worker, who was apparently named Penny, called Canady a "bitch" on several occasions, although Canady acknowledges that Penny treated other employees the same way, regardless of their gender or race. Canady contends that her complaints about harassment brought no effective response from management.

In response to Canady's claims, John Morrell alleges that there were numerous occasions on which Canady was chastised or disciplined for using foul language or exhibiting hostile conduct toward co-workers. These incidents included one in which Canady called a co-worker a "faggott," and another incident in which she called a female co-worker "fucking white trash," a "fucking white bitch," a "fucking slut," and a "white cunt." When the latter co-worker responded by calling Canady a "bitch," John Morrell contends that its investigation revealed that Canady said, "Yeah, I'm a bitch. I'm a black bitch." Canady was again chastised for this behavior. Canady does not dispute these or other incidents for which she was chastised or disciplined by John Morrell managerial personnel, although she contends that she was forced to engage in the conduct of which she is accused by the failure of John Morrell's management to respond to her complaints, which made it necessary for her to stick up for herself. She contends that the environment at John Morrell caused her to use foul language far more frequently than she had ever used it before working there, and far more frequently than she has used such language since finding other employment.

Canady no longer works for John Morrell. Instead, in February 2001, she ap-

plied for and obtained a position at Wells' Dairy in LeMars, Iowa, where she testified that she has not been subjected to any harassment and has not had any conflicts with co-workers or managerial personnel. Although Canady initially made less money at Wells' Dairy than she did working at John Morrell, she now makes a higher wage than she earned at the end of her employment with John Morrell. Canady asserts that she was forced out of her employment with John Morrell, because she just could not take the hostile environment any longer. John Morrell contends that Canady voluntarily quit her job and moved to a new job "without missing a beat" almost immediately after filing her administrative charge of discrimination, which left John Morrell with no opportunity to remedy any sexual or racial discrimination once John Morrell had notice of Canady's claim that the harassment to which she believed that she had been subjected was based on a discriminatory animus. Thus, John Morrell contends that there is no basis in the record for a claim by Canady that she was constructively discharged.

The court will consider below, in its legal analysis, the extent to which there are genuine issues of material fact on key issues, which may include whether or not any harassment was sex- or race-based, the frequency and severity of the harassment, how much of the harassment was reported to John Morrell, whether those reports were sufficient to put John Morrell on notice that Canady was asserting that the harassment was sex- or race-based, and whether Canady was constructively discharged or voluntarily quit.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

As this court has explained on a number of occasions, applying the standards of Rule 56 of the Federal Rules of Civil Procedure providing for summary judgment, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Quick*, 90 F.3d at 1377 (same). Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995). An issue of material fact is

"genuine" if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.,* are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). Finally, this court has repeatedly taken note of the rule in this circuit that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *See, e.g., Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991)). The court will apply these standards to John Morrell's motion for summary judgment on Canady's claims.

**B. Canady's Harassment Claims**

In *Gipson v. KAS Snacktime Co.,* 171 F.3d 574 (8th Cir.1999), the Eighth Circuit Court of Appeals stated that "the same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment." *Gipson,* 171 F.3d at 578 (citations omitted). Therefore, the court will combine its analysis of Canady's racially and sexually hostile environment claims for purposes of summary judgment, beginning with a survey of the parties' arguments for and against summary judgment on those claims.

**1. Arguments of the parties**

John Morrell argues that, although Canady is plainly a member of a protected group, on the basis of her sex and race, she cannot generate genuine issues of material fact on the other elements of her harassment claims, because she cannot show that the harassment was because of sex or race, that the harassment was sufficiently severe or pervasive to affect a term or condition of her employment, or that John Morrell either knew or should have known of the harassment—or that Canady informed John Morrell that the harassment was allegedly because of sex or race—but John Morrell failed to take prompt remedial action.[2] Somewhat more specifically, John Morrell contends that the incidents upon which Canady bases her harassment claims were not sufficiently offensive or were too isolated to constitute actionable harassment. More importantly, however, John Morrell contends that, apart from alleging only isolated use of racial epithets, and epithets with a possible

2. In its opening brief, John Morrell also contends, in passing, that Canady cannot show that the harassment was "unwelcome," but makes no specific attempt in that opening brief to marshal evidence to demonstrate that fact. *See Hartnagel,* 953 F.2d at 395 (the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue"). John Morrell does argue in its opening brief that Canady cannot prove her harassment claims "especially in light of her own admitted and documented conduct and use of abusive and foul language towards her co-workers," but this argument is not in the context of a challenge to the "unwelcomeness" element; it is, instead, in the context of John Morrell's argument that Canady cannot make the connection between any harassment and her gender or race, apparently asserting that this evidence demonstrates only personal animosity.

sexual content, Canady has failed to point to any evidence that the alleged harassment had anything to do with her sex or race. Instead, John Morrell contends that a nexus between the harassment and any protected characteristic is non-existent, where the record shows only personal animosity, and Canady herself purportedly testified that she did not think that specific incidents of alleged harassment had anything to do with race or sex. Finally, John Morrell contends that it was either unaware of or took prompt action to remedy Canady's complaints about harassment. For example, John Morrell contends that the alleged incidents were too isolated to provide constructive notice to the employer of harassment, that Canady never complained about the "hot dog" or "banana" episodes or joke telling, and that Canady has admitted that Labarredo's harassment had nothing to do with race or sex, but was instead the result of a personality conflict. John Morrell contends that it only received notice that any of the incidents that Canady actually reported allegedly were related to Canady's sex or race when Canady filed her administrative complaint of sexual and racial harassment with the Iowa Civil Rights Commission, but that Canady left her employment with John Morrell only a month later, making it impossible for John Morrell to remedy the problems once it had notice that the "harassment" was allegedly based on protected characteristics. John Morrell contends that, without notice from Canady that the harassment had anything to do with her race or sex, John Morrell cannot be held responsible for the harassment, citing *Jacob–Mua v. Veneman,* 289 F.3d 517, 523 (8th Cir.2002).

Canady, however, contends that she has pointed to evidence generating genuine issues of material fact on each of the disputed elements of her harassment claims. She contends that the record evidence generates genuine issues of material fact

that she was subjected to a pattern of severe and pervasive harassment based on both race and sex, which included the following: physical harassment by Labarredo; frequent use of racial and sexual epithets by co-workers John Kueny, John Huffstetler, and Ray Chicoine, including calling her a "black bitch," and questions like, "Get any fucking last night?" or "Are you on the rag?"; offensive touching of her buttocks by Kueny; Huffstetler "mooning" her and telling her to "[k]iss [his] white ass"; a co-worker named Wes Orr calling her a "monkey," which is a racial slur, and also calling her a "fucking bitch" or "black bitch"; frequent use of comments like "bitch" and "fuck you" by co-worker Tim Martinez; sexually suggestive comments by male co-workers and barrages of pieces of meat thrown at her buttocks when she would bend over; the "banana" or "hot dog" incidents in the cafeteria; and physical assaults involving a "kick in the butt" and grabbing a barrel from her. Canady contends that one form or another of this harassment occurred almost daily from 1998 through February 2001, when she left her employment with John Morrell. She contends that even harassment that was not overtly sexual or racial nevertheless contributed to the hostility of the environment, because, for example, Labarredo's campaign of harassment only began after she turned down his request for a date, and because of the overall harassing environment towards women. Canady also contends that, viewed in the light most favorable to her, the record generates genuine issues of material fact that John Morrell knew or should have known of the harassment, because of her multiple complaints; her complaint to Steve Joyce, the Human Resources Manager, that co-worker Herman Johnson was a "racist"; and her call to the police after the "assaults." Even if she did not report specific incidents of harassment, Canady contends that the incidents were so frequent that

John Morrell should have known about them.

In its reply brief, John Morrell argues specifically that Canady cannot generate any genuine issue of material fact that the conduct on which her harassment claims are based was "unwelcome," because she engaged in similar conduct herself. John Morrell then details incidents of "abusive" conduct dished out by Canady to her co-workers, much as Canady detailed the incidents of alleged harassment toward her in her resistance to John Morrell's motion for summary judgment. John Morrell also re-iterates that the majority of the harassing conduct on which Canady bases her claims was not based on sex or race, noting the absence of overt sexual or racial content from most of the harassment. In support of this contention, John Morrell points to the following: the absence of any sexual or racial content in most of the name-calling and the incidents of the alleged "assaults"; the absence of any evidence suggesting the presence of the missing gender- or racial animus for the "neutral" harassment; and Canady's failure to inform John Morrell prior to filing her administrative charge that Labarredo's physical harassment might have been prompted by Canady's refusal to go out with him on a date. John Morrell also reiterates that the alleged conduct, even if it was because of race or sex, was not severe or pervasive enough to constitute actionable harassment, particu-larly in the context of the character of the workplace involved. Finally, John Morrell expands on its argument that Canady nev-er complained that any harassment was sex- or race-based, so that John Morrell cannot be held liable for not taking appro-priate remedial action in response to her complaints.

## 2. Sufficiency of the alleged harass-ment

■ The court agrees with the parties that the elements of Canady's claims of a sexually or racially hostile work environ-ment are the following: (1) that she is a member of a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic, in this case, race or sex; (4) that the harassment affected a term, condition, or privilege of employ-ment; and (5) that the employer knew or should have known of the harassment, but failed to take prompt remedial action. *Compare Jacob–Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir.2002) (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999), for the elements of a claim of sexual harassment); *Rheineck v. Hutchin-son Technology, Inc.*, 261 F.3d 751, 755–56 (8th Cir.2001) (citing the same elements for a sexual harassment claim); *with Wil-lis v. Henderson*, 262 F.3d 801, 808 (8th Cir.2001) (stating these elements for a ra-cially hostile work environment claim); *Ross v. Douglas County, Nebraska*, 234 F.3d 391, 395–96 (8th Cir.2000) (same). *See generally Gipson*, 171 F.3d at 578 ("[T]he same standards are generally used to evaluate claims of hostile work environ-ment based upon sexual harassment and racial harassment."). Leaving aside, for the moment, the question of employer lia-bility, and instead focusing on whether the allegedly "harassing" environment is ac-tionable under Title VII, John Morrell con-tends in its motion for summary judgment that Canady cannot generate genuine is-sues of material fact on the "based on sex or race" element or the "affecting a term or condition of employment" element.[3]

3. The court finds that John Morrell did not properly put at issue in its original motion whether Canady could generate a genuine issue of material fact on the "unwelcome-

ness" element as well, because John Morrell failed to meet its burden, as the movant for summary judgment, to "infor[m] the district court of the basis for its motion and identif[y]

#### a. *Based on sex or race*

■ John Morrell contends that, if Canady was "harassed" at all, the majority of the conduct on which her harassment claims are based was not because of "sex" or "race." The question is whether Canady has designated "specific facts showing that there is a genuine issue for trial," FED. R. CIV. P. 56(e), in light of governing law, see *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing law" are "material."), on the issue of whether Canady was harassed based on her sex or race. *See Jacob–Mua,* 289 F.3d at 522 (third element of a sexual harassment claim); *Willis,* 262 F.3d at 808 (third element of a racial harassment claim).

#### i. *Canady's purported admissions of the lack of animus.* Many—perhaps even most—of the incidents of alleged "harassment" in this case bear no overt indication of racial or sexual animus. However, contrary to John Morrell's assertion, the court finds that Canady has *not* unequivocally stated that certain instances of alleged harassment *were not* because of her race or sex.

For example, John Morrell asserts that "Canady testified that Labarredo did not sexually harass her, nor did he racially harass her." *See* Defendant's Brief in Support of Motion for Summary Judgment at 2 (citing Canady's Deposition at 26); *see also* Defendant's Statement of Undisputed Facts at ¶ 9 (same). However, the court cannot agree that this is the only reasonable reading of Canady's deposition testimony. Instead, in answer to the question, "[Y]ou don't think this [bumping by Labar-

redo] was a sexual touching?" Canady actually testified, "No. I thought it was harassment. He just harassed me every day, physical [sic]," and she then reiterated that Labarredo's conduct was "just physical harassment every day." *See* Defendant's Appendix at 6 (Canady's Deposition at 21, *ll.* 4–11). Canady's opinion that Labarredo's harassment was not "sexual touching," but was, instead, "physical harassment" certainly does not exclude the inference that the "physical harassment" was nevertheless because of sex, at least in light of *Carter v. Chrysler Corp.,* 173 F.3d 693 (8th Cir.1999), as explained more fully below.

Moreover, in a portion of her deposition overlapping that cited by John Morrell, the following exchange appears:

Q. [T]his situation with Edwardo [Labarredo] was personal between coemployees, because he was upset because you didn't want to go out with him?

A. I don't know what the problem was. Like I told Steve Joyce and the union, I don't know what the problem was between him, but I wanted the harassment to stop. Every time I came to work I had to look out for him. I never knew what he was going to do.

Q. You said it wasn't sexual. Did Edwardo ever make any racial remarks to you, Deb?

A. Not that I can remember.

*Id.* at 7–8 (Canady's Deposition at p. 25, *l.* 17 to p. 26, *l.* 3). Thus, *counsel for defendant* characterized Canady's testimony to be that the harassment by Labarredo "wasn't sexual," but that is not necessarily

---

those portions of the record which show lack of a genuine issue" as to the "unwelcomeness" issue. *Hartnagel,* 953 F.2d at 395. The court declines to address the "unwelcomeness" element on the basis of John Morrell's explicit assertion in its reply brief that the

record is insufficient to generate genuine issues of material fact on that element. The court finds that, because the issue was only fairly presented in John Morrell's reply, Canady has not had a full and fair opportunity to address the evidence related to that element.

the only reasonable interpretation of Canady's prior testimony that the "harassment" was not "sexual touching," just "physical harassment." Nor does the quoted portion of Canady's testimony just above, which states that Labarredo never made any racial remarks, necessarily carry the indisputable inference that the harassment was *not* because of race. Similarly, as to John Morrell's contention that Canady acknowledged that no sexual or racial remarks were made during other instances of alleged harassment, the inference that those instances were not because of race or sex does not necessarily or inevitably follow.

***ii. Animus in gender- and race-neutral incidents.*** Instead, Canady is correct that the Eighth Circuit Court of Appeals has recognized, for example, in *Carter v. Chrysler Corp.*, 173 F.3d 693 (8th Cir. 1999), that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII." *Carter*, 173 F.3d at 701 (citations omitted). In *Carter*, the court specifically added that "[h]arassment alleged to be because of sex need not be explicitly sexual in nature." *Id.* (citations omitted). The same, it would seem, would also be true of racial harassment—that is, that "[h]arassment alleged to be because of [race] need not be explicitly [racial] in nature." *See Gipson*, 171 F.3d at 578 ("[T]he same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment."); *see also Carter*, 173 F.3d at 700–01 (discussing inferences of discriminatory animus in the context of claims of both racial and sexual harassment). What the court in *Carter* concluded *would* establish a sexually or racially hostile environment, even in the absence of overtly sexual or racial harassment, was that the gender- or racially-neutral conduct must be "part of a course of conduct which is tied to evidence of discriminatory animus." *Carter*, 173

F.3d at 701. Thus, John Morrell's assertions that Canady acknowledged that various incidents of alleged harassment involved no overtly racial or sexual content only begs the question under *Carter* of whether the harassment was nevertheless because of sex or race.

Canady has generated genuine issues of material fact that the harassing conduct was "part of a course of conduct," the first requirement under *Carter* for showing that the gender- and racially-neutral harassment was nevertheless because of sex or race, *see id.*, in light of her testimony that she was subjected to one form or another of harassment almost daily. However, the court is not equally convinced that Canady has generated a genuine issue of material fact that this "course of conduct" is *"tied to evidence of discriminatory animus." Id.* (emphasis added). Indeed, Canady's assertions regarding animus amount to little more than a contention that the fact of a course of conduct *itself* demonstrates that the whole course of conduct has the necessary racial or sexual animus, and that would not be enough under *Carter*. Instead, the court must see if Canady has generated genuine issues of material fact that the necessary "tie" exists, based on evidence beyond the mere existence of a course of conduct. Before the court can do that, however, the court must first determine which conduct is "gender-based," which is "race-based," and which is "neutral."

Canady has pointed to use of the terms "bitch," "black bitch," "nigger," and "monkey," for example, as contributing to the hostile environment in this case, asserting that such epithets taint even sexually- or racially-neutral conduct in the pattern of harassment with discriminatory animus. In *Carter*, the Eighth Circuit Court of Appeals recognized that "gender-based insults, including the term 'bitch,' may give

rise to an inference of discrimination based on sex," and that "racial epithets are often the basis for racial harassment claims, and may likewise create an inference that racial animus motivated other conduct as well." *Carter*, 173 F.3d at 700–01 (citations omitted). However, in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the Supreme Court stated that the nature of the workplace and "the social context in which particular behavior occurs and is experienced by its target" is relevant to determining whether an environment is sufficiently harassing to be actionable. *Oncale*, 523 U.S. at 81–82, 118 S.Ct. 998. Thus, the court must determine *in the context of this case* which conduct is "gender-based," which is "race-based," and which is "neutral."

***iii. Gender-based comments and conduct.*** The court concludes that the inferences of sexually discriminatory animus to be drawn from use of the term "bitch," in the present context, are tepid at best, where Canady herself admitted that that particular epithet was used by and among women, as well as by men towards women. Moreover, the context presented in this case, involves a rather rough-and-ready production line. *See id.* (context is relevant to whether alleged harassment is actionable). Indeed, John Morrell's counsel characterized the context as "raucous" and "a four-letter wordfest." The court agrees that both characterizations are indisputably supported by the record. In such a context, use of the term "bitch," standing alone, suggests little more than "gender identification"; the term does not convey a gender-based animus. One assumes that, in this context, persons of either gender would call a man a "bastard," for example, rather than a "bitch," intending the term chosen to be derogatory and gender-tailored, but not necessarily intending the term to suggest hostility to men in the workplace. Moreover, there is evidence in

this case, including Canady's own testimony, that men did indeed use similarly foul and derogatory terms, such as "suck ass" or "asshole," towards other men. In contrast, in *Joens v. John Morrell & Co.*, 243 F.Supp.2d 920 (N.D.Iowa 2003), this court suggested that there would be an "arguable" inference of sexual animus from comments like "Why do they let a fucking bitch like you try to do this job?" *See Joens*, 243 F.Supp.2d at ——, 2003 WL 260717 at *19. This is so, this court concluded, *because such a comment suggests hostility to women in the workplace. Id.*

Thus, where Canady has only pointed to use of the term "bitch" as a gender identifier—that is, where she has pointed to incidents in which that epithet is not tied to conduct or comments that demonstrate that the gender-identifier, however foul, is used with a specifically sexual animus in a generally foul-mouthed and raucous environment—the court does not believe that an inference of sexually discriminatory animus can reasonably be drawn from use of the term, standing alone. This is so, even giving Canady the benefit of all reasonable inferences that can be drawn from the facts, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377, and even recognizing that, in some contexts, an inference of sexual animus from use of the term "bitch" is reasonable. *See Carter*, 173 F.3d at 700. The context is the key to the reasonableness of the inferences, *see Oncale*, 523 U.S. at 81–82, 118 S.Ct. 998, and the context here simply won't support an inference of sexual animus from mere use of the term "bitch."

Therefore, for the reasons stated above, no reasonable inference of gender-based animus arises from incidents in which co-worker Wes Orr allegedly called Canady a "fucking bitch"; frequent use of comments like "bitch" and "fuck you" by co-worker Tim Martinez; or incidents in which fe-

male employees called Canady a "bitch." These incidents must, instead, be regarded as "gender-neutral," in the context of this case, because they involve mere use of the foul epithet as a "gender-identifier," not as a term conveying sexual animus.

On the other hand, the court concludes that the following incidents, identified by Canady, could reasonably be viewed as sex-based: frequent use of sexual comments by co-workers John Kueny, John Huffstetler, and Ray Chicoine, including questions like, "Get any fucking last night?" or "Are you on the rag?"; offensive touching of Canady's buttocks by Kueny; Huffstetler "mooning" Canady and telling her to "[k]iss [his] white ass"; sexually suggestive comments by male co-workers and barrages of pieces of meat thrown at Canady's buttocks when she would bend over; and the "banana" or "hot dog" incidents in the cafeteria. Each of these incidents reasonably conveys an inference of sexual offensiveness or hostility beyond mere "gender-identification."

*iv. Race-based comments and conduct.* In contrast to the lack of an inference of sexual animus from use of the term "bitch," standing alone, the inference of racial animus from epithets such as "nigger," "black bitch," and "monkey" (which is a common racial slur), even standing alone, is inescapable in this or any other context. *Carter*, 173 F.3d at 701 ("[R]acial epithets are often the basis of racial harassment claims, and may ... create an inference that racial animus motivated other conduct as well.") (citations omitted); *see also Oncale*, 523 U.S. at 81–82, 118 S.Ct. 998 (inferences of discriminatory animus must be viewed in the context in which the conduct or comments were made). Such epithets are appalling and unnecessary and—at least when addressed to an African–American by a person of a different race—are reasonably understood to have no other purpose than to express racial animus. Therefore, the court finds that the following incidents, identified by Canady, could reasonably be viewed as race-based: use of racial epithets by co-workers John Kueny, John Huffstetler, and Ray Chicoine, including calling Canady a "black bitch"; unidentified co-workers calling her a "nigger"; and co-worker Wes Orr calling Canady a "monkey" and "black bitch." In addition, the court concludes that the incident in which Huffstetler allegedly "mooned" Canady and told her to "[k]iss [his] white ass" reasonably conveys an inference of racial animus, because Huffstetler explicitly referred to his own race and coupled that reference to a patently offensive gesture.

*v. Looking for the "tie."* Although the court has determined that Canady has identified some incidents that the court finds generate a reasonable inference of gender- or race-based animus, that is not the end of the analysis. Instead, Canady also asserts that various incidents, which the court finds are "neutral," nevertheless are actionable as part of the pattern of discriminatory harassment. The court finds that those "neutral incidents" include the following: myriad incidents involving use of the term "bitch" by both men and women merely as a "gender-identifier"; physical harassment by Labarredo (assuming that such incidents are not time-barred); and physical assaults, such as the "kick in the butt" by Kim Henshaw, and the incident in which an unidentified Hispanic co-worker grabbed a barrel out of Canady's hand. The question in light of *Carter* is whether there is a "tie" between these "neutral" incidents and a discriminatory animus, such that the "neutral" incidents are also tainted with discriminatory animus. *See Carter*, 173 F.3d at 701. Canady, the non-movant for summary judgment, bears the burden of designating "specific facts showing that there is a genuine issue for trial" on the issue of whether

such a "tie" can be shown. *See* Fᴇᴅ. R. Cɪᴠ. P. 56(e) (identifying the non-movant's burden).

The court finds that it is a close question whether Canady has shown a basis for "tying" any sexual or racial animus, from the incidents that the court finds reasonably suggest a sex- or race-based animus, to the "neutral incidents" to form a pattern of prohibited discrimination including those "neutral incidents." On the one hand, where Canady has pointed to no evidence that the incidents involving sexual or racial content and the "neutral" incidents involved the same harassers, were otherwise interrelated factually, or were contemporaneous or sufficiently close in time that the animus from gender- or race-related comments might logically taint the gender- or race-neutral incidents, there would seem to be no "tie." *See, e.g., Carter*, 173 F.3d at 701 (considering whether the persons who engaged in "neutral" harassment also engaged in sexual or racial taunting to determine whether the "neutral" harassment was part of a pattern of harassment prohibited by Title VII). On the other hand, Canady asserts that there is evidence of "targeting" of women or African–Americans in this case, which she asserts suggests that the victim's gender or race was the reason for at least some of the "neutral" harassment.

Some of this court's discussion in *Joens* of the inferences to be drawn from alleged "targeting" of victims, based on a protected characteristic, bears repeating here. In *Joens*, this court noted that "targeting" of women for gender-neutral harassment can give rise to an inference of gender-based animus, as follows:

> [T]he Eighth Circuit Court of Appeals concluded that in a case supposedly involving the same conduct toward men and women,
>
> > [a] plaintiff ... need not show ... that only women were subjected to

harassment, so long as she shows that women were the primary target of such harassment. *See Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir.1996). Viewing the evidence in the light most favorable to [the plaintiff] a jury could reasonably find that the vast majority of [the harasser's] activities of a harassing nature was directed toward female employees, and could thus conclude that the harassment of [the plaintiff] was based on sex.

> *Beard [v. Flying J, Inc.]*, 266 F.3d [792,] 798 [ (8th Cir.2001) ].

*Joens*, 243 F.Supp.2d at 930. In *Joens*, this court found an inference of sexually discriminatory animus in evidence that only the female plaintiff, not the male employees in her department, was ever subjected to abusive, but gender-neutral tirades by the lone male harasser. *See Joens*, 243 F.3d at 928–930. Therefore, in light of *Carter* and *Joens*, the court must consider this question: Has Canady generated genuine issues of material fact that the sexually- or racially-neutral incidents are "tied" to a discriminatory animus that might taint the entire pattern of harassment, because the "neutral" instances of harassment were aimed "primarily" at women or African–Americans?

Here, Canady conceded that some of the verbally "harassing" conduct was common between men and women and people of different races. On the other hand, she also testified in deposition that there was a pattern of male co-workers specifically selecting females as the targets of their harassment, because "every day males [were] harassing females. They wasn't [sic] harassing males, it was just male against female." Additional Excerpts From The Deposition of Debra Canady (attached as an exhibit to Plaintiff's Re-

sponse To Defendant's Statement Of Undisputed Material Facts And Plaintiff's Statement Of Additional Facts) at p. 88, *ll.* 10–16; Canady Affidavit (also attached as an exhibit to Plaintiff's Response) at ¶ 16 (averring that Kueny, Chicoine, and Huffstetler could be rude to men as well, but never said or did to men any of the sexually demeaning things that they did to Canady). There is also at least some evidence of racial "targeting" of the plaintiff for harassment. For example, Canady also testified that she felt that she subjected to harassment to which white or Hispanic employees, and more particularly, white or Hispanic males, were not, because she was the only African–American working in her department during most of the time that she was employed at John Morrell. *See, e.g.,* Canady's Affidavit, ¶ 7 (averring that she was the only African–American female working in her area and that she never saw Labarredo treat any other co-worker like he treated her).

Canady's testimony of "targeting" is a tenuous thread with which to try to tie "neutral" harassment to a sexually- or racially-discriminatory animus, because it is often unclear what evidence provides the basis for Canady's impression that she was targeted because of her sex or race, and there is some conflict in her own testimony about whether or not such "targeting" occurred. Also, the evidence in this case that women were the "primary targets" of harassment is admittedly more uncertain than it was in *Joens,* where there is extensive evidence in this case, absent in *Joens,* that women as well as men engaged in some of the same kinds of "neutral" conduct towards women, such as use of the epithet "bitch," and evidence that men used terms 'like "suck ass" and "asshole" towards other men. However, it is not for the court to weigh or compare apparently conflicting evidence on a motion for summary judgment, if the evidence is sufficient to generate a genuine issue of material

fact on the question of whether there was "targeting." *Quick,* 90 F.3d at 1376–77. Because Canady's deposition testimony and affidavit are a real basis in the record for her contention that certain kinds of "neutral" harassment were "targeted" primarily towards females, or were directed at her because she was the only African–American employee in her department, she has generated genuine issues of material fact on the question of whether there was a "tie" between that sexually- or racially-neutral harassment and a sexually or racially discriminatory animus. *See Hartnagel,* 953 F.2d at 394 (explaining that an issue of material fact is "genuine" if it has a real basis in the record, citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348).

Therefore, although it is by the barest margin, the court concludes that Canady has generated a genuine issue of material fact that even the gender- or racially-neutral harassment identified in this case may be "part of a course of conduct which is tied to evidence of discriminatory animus." *See Carter,* 173 F.3d at 701 (noting that the plaintiff had "produced evidence from which a factfinder could reasonably conclude that she experienced a hostile work environment motivated by her sex or race," because of the "continual" use of sexual or racial epithets in the harassers' taunting). That being so, Canady has also, just barely, generated a genuine issue of material fact that, unless excepted above, all of the conduct at issue in her claims was because of race or gender. *Id.*

### b. *Affecting a term or condition of employment*

 John Morrell also contends that, even if the conduct to which Canady was subjected was based on her sex or race, it was not sufficient, as a matter of law, to affect a term, condition, or privilege of

employment, *see Jacob–Mua*, 289 F.3d at 522 (fourth element of a sexual harassment claim); *Willis*, 262 F.3d at 808 (fourth element of a racial harassment claim), in that it was not sufficiently "severe or pervasive." As the Eighth Circuit Court of Appeals also explained in *Beard v. Flying J, Inc.*, 266 F.3d 792 (8th Cir.2001), with regard to this element of a sexual harassment claim, "Title VII makes actionable only conduct that is 'severe or pervasive' enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Beard*, 266 F.3d at 798 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also Carter*, 173 F.3d at 701 (racial and sexual harassment case in which the court observed, "Even if a plaintiff demonstrates discriminatory harassment, Title VII only reaches such conduct if it is severe or pervasive enough to alter the conditions of employment.").

As in *Joens*, 243 F.Supp.2d at 931, John Morrell relies on cases involving parades of horribles in which the Eighth Circuit Court of Appeals has nevertheless held that the alleged harassment was not sufficiently severe or pervasive to be actionable as demonstrating that the conduct toward Canady in this case does not constitute actionable harassment. *See Duncan v. General Motors Corp.*, 300 F.3d 928, 931–32 (8th Cir.2002); *Willis*, 262 F.3d at 803–06 & 809; *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 966–67 (8th Cir.1999). In all three cases upon which John Morrell relies, the court explained that pertinent factors to consider in determining whether conduct was sufficiently severe or pervasive include the following: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See Duncan*, 300 F.3d at 934; *Willis*, 262

F.3d at 809; *Scusa*, 181 F.3d at 967. In all three of these cases, the court rejected the sufficiency of the plaintiff's allegations on the ground that the incidents cited were too few and far between. *See Duncan*, 300 F.3d at 935 (rejecting the claim based on "four categories" of conduct involving nine or ten incidents); *Willis*, 262 F.3d at 809 (the court's ultimate finding was that the environment was not sufficiently severe or pervasive, where there were several isolated incidents, but the most serious incident, involving a racial offensive cartoon, was not repeated and the harassment stopped after that incident); *Scusa*, 181 F.3d at 967 (observing that the plaintiff relied on only nine incidents). Here, on the other hand, Canady has designated "specific facts showing that there is a genuine issue for trial" on the issue of severity and pervasiveness, *see* FED. R. CIV. P. 56(e) (identifying the non-movant's burden), by pointing to her deposition testimony that one form or another of harassment occurred almost daily over several years. Such "daily" harassment includes evidence of "physical harassment" by Labarredo and "assaults" by two other male employees, which may be tied—albeit tenuously, as the court noted above—to evidence more clearly demonstrating a discriminatory animus. Moreover, the court finds that, even considering *only* evidence of incidents that the court has found could reasonably be considered gender- or race-based, in and of themselves, Canady has identified evidence of conduct that a jury could reasonably find was frequent, severe, humiliating, physically threatening, and might have interfered with her work performance, and thus, is sufficient to create a triable issue on her sexual and racial harassment claims. *See, e.g. Duncan*, 300 F.3d at 934 (listing these factors). The court cannot simply weigh the evidence and determine the truth of the matter, as John Morrell seems to ask the court to do, but must

instead determine whether there are genuine issues for trial. *Quick,* 90 F.3d at 1376–77. Such genuine issues of material fact are present here on this element of Canady's claim of sexual harassment. Although John Morrell may have a jury argument that the incidents that Canady ultimately proves to be sex- or race-based, or adequately "tied" to a discriminatory animus, are too isolated to impose liability, that is not the only reasonable inference from the summary judgment record.

### 3. *Employer liability*

Finding that Canady has (or may have) otherwise generated genuine issues of material fact on the elements of her hostile environment claims, the court turns, next, to the question of whether she can generate genuine issues of material fact that John Morrell should be held liable for the harassment to which she was allegedly subjected. In this case, there is no dispute that the sexual and racial harassment claims are based on "co-worker harassment." *Compare Joens,* 243 F.Supp.2d at 931 (the question of employer liability depended upon the applicable standard, which in turn depended upon whether the alleged harasser was the plaintiff's "supervisor" or only a "co-worker"). Therefore, the applicable standard for employer liability is whether the employer knew or should have known of the harassment, but failed to take prompt remedial action. *Compare Jacob–Mua,* 289 F.3d at 522 (citing *Carter,* 173 F.3d at 700, for the elements of a claim of sexual harassment in a "co-worker harassment" case); *Rheineck,* 261 F.3d at 755–56 (same); *with Willis,* 262 F.3d at 808 (stating elements of racially hostile work environment in a "co-worker harassment" case); *Ross,* 234 F.3d at 395–96 (same). *See generally Dhyne v. Meiners Thriftway, Inc.,* 184 F.3d 983, 987 (8th Cir.1999) (recognizing that this standard of "direct" liability still applies to "co-worker harassment" after *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

Canady contends that she "repeatedly" complained to John Morrell managers or supervisors about "harassment" by co-workers. She also contends that the "harassment" was so frequent that John Morrell had constructive knowledge of it. Consequently, she contends that she has, at a minimum, generated genuine issues of material fact that John Morrell either knew or should have known of the sexual and racial harassment. However, John Morrell contends that Canady either never complained at all about certain incidents, or that it was not until Canady filed her administrative charge of discrimination that John Morrell had any idea that Canady was complaining that the "harassment" she brought to the attention of management was supposedly "based on sex" or "based on race." As in *Joens,* John Morrell relies for this particular argument on *Jacob–Mua v. Veneman,* 289 F.3d 517 (8th Cir.2002).

#### a. *What is sufficient to put an employer on notice?*

In *Joens,* this court considered what constitutes sufficient notice that alleged harassment is "based on sex," or some other protected characteristic, relying primarily on *Jacob–Mua* to determine the answer to that question. *See Joens,* 243 F.Supp.2d at 943–945. This court concluded that, under *Jacob–Mua,* this court must first consider "whether the plaintiff had 'declare[d], indicate[d], or even impl[ied]' that [complained of conduct] had anything to do with' a protected characteristic." *Id.* at 944 (quoting *Ja-*

cob–Mua, 289 F.3d at 523). However, this court concluded that, even in the absence of such an express indication from the plaintiff, the decision in Jacob–Mua taught that "sufficient notice may also be given that harassing or offensive conduct is based on a protected characteristic *if the circumstances reported 'arguably' suggest a discriminatory animus.*" Id. (quoting Jacob–Mua, 289 F.3d at 523, with emphasis added in Joens ). This court also noted that, "[b]y 'arguably,' this court assumes that, in the context of a summary judgment motion, the Eighth Circuit Court of Appeals in Jacob–Mua meant evidence that a reasonable jury could find would have suggested to an employer that a discriminatory animus was afoot." Id. (citing Jacob–Mua, 289 F.3d at 523, which considered the appeal of the district court's grant of summary judgment, and noted, inter alia, that "[s]ummary judgment should be cautiously granted in discrimination cases because such cases often depend on inferences rather than on direct evidence"). In Joens, this court held that there was no evidence of either kind of notice to the employer that the alleged harassment was "because of sex." First, as to express indications, the court held that the plaintiff never so much as indicated that her harasser did not treat male employees in her department in the same way. As to "arguable" indications of discriminatory animus, this court held that harassment of a female by a male was not enough, on the basis of the gender difference alone, to make the incidents "arguably" gender influenced, and that the description of the incidents given to the employer in that case did not disclose any gender-based animus as patently, or even "arguably," as the unreported comments and questions, rife with racial content, disclosed a racial animus in Jacob–Mua. See id. at 945 (citing the catalogue of racially influenced re-marks and questions in Jacob–Mua, 289 F.3d at 523, which the court in Jacob–Mua found would "arguably" have conveyed racial animus, if they had been reported to management). As this court noted, " 'Absent evidence in the record indicating her employer or supervisor knew or should have known of [sexually or racially] harassing conduct, [the plaintiff] does not have a viable co-worker hostile work environment claim.' " Id. at 945 (quoting Jacob–Mua, 289 F.3d at 523).

On an issue not considered in Joens, but squarely presented here, the Eighth Circuit Court of Appeals has also held that, where incidents of harassment were "so egregious, numerous, and concentrated as to add up to a campaign of harassment, ... the employer will be culpable for failing to discover what is going on and to take remedial steps." See Hall v. Gus Const. Co., Inc., 842 F.2d 1010, 1016 (8th Cir.1988). Thus, the court must also consider whether the incidents of harassment, in and of themselves, provided sufficient "notice," such that the employer can be culpable simply for failing to discover and remedy them.

### b. Was there sufficient notice in this case?

■ **i. Constructive notice from circumstances.** In this case, the court concluded, above, that there were genuine issues of material fact as to whether there was a pattern of frequent harassment prohibited by Title VII, including "neutral" incidents that the plaintiff has tied, however tenuously, to a discriminatory animus. The court also concluded, above, that there were genuine issues of material fact as to whether incidents that, in and of themselves, generated inferences of sex- or race-based animus were sufficient to constitute an actionable environment of harassment without consideration of whether other "neutral" incidents were

also part of a pattern of harassment. Nevertheless, contrary to Canady's contentions, this court cannot conclude that Canady has generated genuine issues of material fact that this whole "pattern" of harassment involved incidents that were "so egregious, numerous, and concentrated as to add up to a campaign of harassment," such that she has also generated genuine issues of material fact that "[John Morrell might be] culpable for failing to discover what is going on and to take remedial steps." *See Hall,* 842 F.2d at 1016. This is so, precisely because the whole pattern of harassment is tied so very tenuously, if at all, to evidence of a racially- or sexually-discriminatory animus—that is, to evidence demonstrating racial or sexual content or "targeting" of victims based on race or sex—and precisely because a close jury question was presented on whether the more plainly race- and sex-based incidents, in and of themselves, were sufficiently severe or pervasive to be actionable.

To put it another way, even if they are *actionable,* the incidents involving overtly sexual or racial content or epithets were so comparatively isolated or sporadic in this case that an employer cannot reasonably be held culpable for failing to recognize that either those incidents or the whole spectrum of harassment might be part of a pattern of sexually- or racially-discriminatory harassment. *See id.* (holding that "when [racial slurs] are so egregious, numerous, and concentrated as to add up to a campaign of harassment … the employer will be culpable for failing to discover what is going on and to take remedial steps"); *cf. Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833–35 (8th Cir.2002) (concluding that, in light of *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), on a motion for summary judgment or judgment as a matter of law, the plaintiff's *prima facie* case may be sufficient to gen-

erate genuine issues of material fact that the employer's real reason for adverse employment action is a discriminatory animus, but the *prima facie* case may be too weak to generate such genuine issues of material fact in light of other evidence, and further evidence of discriminatory animus may be required). Because it is barely reasonable to conclude that the whole spectrum of incidents was motivated by sexual or racial animus, it is patently unreasonable to hold that the incidents were "so egregious, numerous, and concentrated as to add up to a campaign of harassment"—by which this court believes the Eighth Circuit Court of Appeals intended a "campaign of *discriminatory* harassment"—such that "the employer will be culpable for failing to discover what is going on and to take remedial steps." *See Hall,* 842 F.2d at 1016. As noted above, Canady has failed to demonstrate that the incidents involving sexual or racial content and the "neutral" incidents involved the same harassers, were otherwise interrelated factually, or were contemporaneous or sufficiently close in time that the animus from gender- or race-related comments might logically taint the gender- or race-neutral incidents, and her evidence of "targeting" of victims on the basis of race and gender is tenuous at best. Under these circumstances, the court does not believe that an inference of constructive notice to Canady's employer of discriminatory harassment is reasonable, even if a inference that the harassment was actionable is reasonable. Therefore, whether Canady has generated genuine issues of material fact on the "knew or should have known" element of employer liability depends on the court's consideration of the prongs of the *Jacob–Mua* "notice" analysis.

***ii. Express indications that discrimination was afoot.*** Under the first prong of the *Jacob–Mua* analysis, which this court will refer to here as the "express indications" prong, this court must consid-

er "whether the plaintiff had 'declare[d], indicate[d], or even impl[ied] that [complained of conduct] had anything to do with' a protected characteristic." *Joens,* 243 F.Supp.2d at 944 (finding that this was the first step in the "notice" analysis under *Jacob–Mua,* 289 F.3d at 523). The only evidence that Canady marshaled in her brief that she ever did such a thing in this case is her assertion that she told Steve Joyce, the Human Resources Manager for John Morrell, that a co-worker named Herman Johnson was a "racist." *See* FED. R. CIV. P. 56(e) (the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"). John Morrell's denial that any such report was ever made only serves to generate a genuine issue of material fact on the question of whether the report was actually made. However, even if made, the report itself is too slender a reed on which to carry "notice" in this case. No reasonable jury could conclude from such a report, which had nothing to do with any particular incident or any incidents involving other alleged harassers, that John Morrell had notice that race discrimination was afoot as to any particular incident or series of incidents of "harassment."

However, Canady elsewhere pointed to evidence that she contends generates genuine issues of material fact as to "whether [she] had 'declare[d], indicate[d], or even impl[ied] that [complained of conduct] had anything to do with' a protected characteristic." *Joens,* 243 F.Supp.2d at 944. She contends, generally, that she reported *every* incident of alleged harassment to supervisors, union representatives, and/or managerial personnel in the human resources department. If Canady reported that she believed that certain incidents

involved sexual or racial harassment, or that she believed that she had been targeted for certain incidents of harassment because of her sex or race, it would be an easy matter to conclude that she had generated genuine issues of material fact on this prong of the "notice" inquiry with regard to her sexual and racial harassment claims. However, Canady has pointed to no such evidence in the record that "[she] had 'declare[d], indicate[d], or even impl[ied] that [complained of conduct] had anything to do with' a protected characteristic." *Id.; see also Jacob–Mua,* 289 F.3d at 523 (although the plaintiff reported an incident in which her supervisor yelled at her and threw keys at her, she did not "declare, indicate, or even imply that the altercation had anything to do with race"). Although the record is replete with Canady's assertions that she reported incidents of "harassment," it is devoid of evidence that her reports included any "declar[ation,] indicat[ion], or even impl[ication] that the altercation[s] had anything to do with race [or sex]." *Jacob–Mua,* 289 F.3d at 523.

Therefore, the court turns to the second prong of the *Jacob–Mua* "notice" analysis, as this court interpreted that analysis in *Joens.*

■ *iii. "Arguable" indications that discrimination was afoot.* This court concluded that, under *Jacob–Mua,* in the absence of express indications of discriminatory animus, "sufficient notice may also be given that harassing or offensive conduct is based on a protected characteristic *if the circumstances reported 'arguably' suggest a discriminatory animus."* *Joens,* 243 F.Supp.2d at 944 (quoting *Jacob–Mua,* 289 F.3d at 523, with emphasis added in *Joens* ). This court will refer to this prong of the *Jacob–Mua* "notice" analysis as the "inferential notice" prong. However, the record is thin, at best, that Canady's myriad reports of "harassment"

ever provided the degree of factual completeness from which might have come "inferential notice" that the harassment was allegedly because of sex or race.

Specifically, as to reports of what Canady now alleges was sexual harassment, there is no evidence in the record that prior to filing her administrative charge Canady ever informed John Morrell that the "physical harassment" by Labarredo might have been prompted by her turning down a date with him, which might "arguably" have suggested a sexually-discriminatory motive for Labarredo's harassment. This is true, despite the numerous meetings Canady had with John Morrell managerial personnel about the "personality conflicts" between Labarredo and Canady. By the time that Canady filed her administrative charge, Labarredo had already been fired. Reports of the "assaults," involving the "kick in the butt" and the grabbing of a barrel from Canady, provided no "arguable" inference of sexual or racial discrimination. Finally, even assuming that Canady reported incidents in which she was called a "bitch," and even though this court recognized above that use of the term "bitch" might generate an inference of sexually-discriminatory animus under *some* circumstances, under the circumstances presented *here,* such reports still did not "arguably" provide notice to John Morrell that sexual harassment was afoot.

On the other hand, in her affidavit, Canady reiterates the details of some of the incidents that the court held, above, generated reasonable inferences of sexual harassment—including frequent use of sexual comments by co-workers John Kueny, John Huffstetler, and Ray Chicoine, including questions like, "Get any fucking last night?" or "Are you on the rag?," *see* Canady Affidavit at ¶ 13; offensive touching of Canady's buttocks by Kueny, *see id.* at ¶ 14; Huffstetler "mooning" Canady and telling her to "[k]iss [his] white ass," *see id.* at ¶ 15; sexually suggestive comments by male co-workers and barrages of pieces of meat thrown at Canady's buttocks when she would bend over, *see id.* at ¶ 20; and the "banana" or "hot dog" incidents in the cafeteria, *see id.* at 21. These averments concerning the harassment are followed by Canady's averment that "I complained about what was going on several times to one of the foremen, Denny Reitz, and to the union, including Ron Hasse and Warren Baker. The harassment always continued." *Id.* at ¶ 23.[4] Ca-

---

**4.** John Morrell now disputes whether reports to a foreman or union representative would constitute actual or constructive notice to John Morrell's management, but the court finds that these contentions have not been properly presented on summary judgment, because they were not raised in John Morrell's original moving papers. Therefore, the court need not address those questions at this time. In the alternative, if the question of the sufficiency of notice to a foreman to serve as notice to management is properly presented, the court concludes that a jury question is presented, on the present record, in light of evidence that at least some reports to foremen were forwarded to human resources managers, which might create a reasonable expectation that all reports to foremen were forwarded in that fashion. In contrast, the court sees nothing in the summary judgment record that demonstrates that notice to union representatives necessarily constituted notice to John Morrell's management. While Canady may be able to produce such evidence at trial—for example, there may be provisions of the collective bargaining agreement that required union representatives to forward complaints of harassment or discrimination to John Morrell's management—and the court considers that question to be open for trial, Canady has not identified any such evidence in the summary judgment record. Therefore, the court relies only on John Morrell's failure to present fairly its contention that notice to union representatives did not constitute notice to John Morrell as the basis for rejecting that contention at this time.

nady's evidence that she reported the facts of these incidents is sufficiently like the sort of detail that the court in *Jacob–Mua* found would have "arguably" disclosed a discriminatory animus, had certain incidents been reported. *See Jacob–Mua*, 289 F.3d at 523 (finding that incidents that, at least "arguably," would have disclosed a racial animus consisted of "questions 'about being black' such as 'how often she wash[ed] her hair,' and 'how much does it cost to braid [her] hair,'" comments like "'slavery wasn't all that bad,'" and other patently "offensive questions" like "'[W]hen are [you] leaving?' and '[W]hen are [you] going back to Africa?''" but that the plaintiff had never reported such incidents). Therefore, such evidence is sufficient to generate genuine issues of material fact that Canady reported incidents that, at least "arguably," disclosed a sexual animus, making summary judgment inappropriate on this "inferential notice" prong of the "notice" inquiry with regard to Canady's sexual harassment claim.

The court also concludes that, albeit tenuously, Canady has generated genuine issues of material fact on the "inferential notice" prong of the "notice" inquiry under *Jacob–Mua* as to her claims of racial harassment, as well. This is so, even disregarding any "inferential notice" from Canady's statement to managerial personnel that Herman Johnson was a "racist," for essentially the same reasons that such a report provided no "express indication" that race discrimination was afoot, either. In Canady's deposition, the only testimony concerning a report to management of explicitly racial conduct was her testimony concerning her report of an incident in which a Hispanic worker, whose name Canady did not know, called her a "nigger," a report to which Canady contends that human resources personnel responded by "talking" to the co-worker. *See* Canady's Deposition at pp. 43–44; *and compare* Canady Affidavit at ¶ 19 (averring, "There

were Hispanic males working in my area who would ... call me a 'nigger'"). In her affidavit, Canady also avers that she reported the incident in which Huffstetler "mooned" her and said, "Kiss my white ass," *see* Canady Affidavit at ¶ 15, and the incidents in which Wes Orr called her a "monkey" and a "black bitch," *see id.* at ¶ 19, because she avers that she reported these incidents to foreman Denny Reitz and union representatives. *See id.* at 23. Although Canady has not pointed to any evidence that she complained about other kinds of harassment in such a way that the incidents, as reported, "arguably" suggested a racially discriminatory animus, the evidence to which she has pointed is sufficient to generate a genuine issue of material fact that John Morrell either knew or should have known about racial harassment under the "inferential notice" prong of the *Jacob–Mua* "notice" analysis.

#### c. John Morrell's response to reports of harassment

John Morrell also contends that, even if it had adequate notice of the allegedly discriminatory nature of some of the "harassment," there is no genuine issue of material fact that it took prompt remedial action. *Compare Jacob–Mua*, 289 F.3d at 522 (citing *Carter*, 173 F.3d at 700, for the elements of a claim of sexual harassment in a "co-worker harassment" case); *Rheineck*, 261 F.3d at 755–56 (same); *with Willis*, 262 F.3d at 808 (stating elements of racially hostile work environment in a "co-worker harassment" case); *Ross*, 234 F.3d at 395–96 (same). *See generally Dhyne*, 184 F.3d at 987 (recognizing that this standard of "direct" liability still applies to "co-worker harassment" after *Ellerth* and *Faragher*). However, this prong of the "employer liability" element need not detain the court long. Canady has pointed to copious evidence that John Morrell did little or nothing to stop the harassment to

which she was subjected when she reported it. To the contrary, evidence generating a genuine issue of material fact that John Morrell responded adequately relates only to a few, discrete incidents, such as evidence that Labarredo was purportedly terminated, at least in part, because of his harassment of Canady, and evidence that John Morrell "talked" to the Hispanic male that Canady reported had called her a "nigger," at least in the absence of evidence that that co-worker call Canady a "nigger" or used similar epithets on a later occasion. Therefore, John Morrell is not entitled to summary judgment on the ground that it took prompt remedial action in response to reports of discriminatory harassment.

Therefore, John Morrell's motion for summary judgment on Canady's claims of sexual and racial harassment will be denied and this matter will, instead, proceed to trial on those claims.

### C. Retaliation

#### 1. Arguments of the parties

John Morrell has also moved for summary judgment on Canady's claim of retaliation in violation of Title VII. John Morrell argues, first, that Canady cannot show any adverse employment action upon which to base such a claim. John Morrell also argues that there is no connection to be found between any supposed adverse employment action and any protected activity, because Canady never informed John Morrell managers prior to filing her administrative charge that she believed that any harassment was because of race or sex, and she testified that she did not think that any manager, supervisor, or co-worker knew about her administrative charge before she left her employment at John Morrell.

In response, Canady alleges that the adverse employment action upon which her retaliation claim is premised is a constructive discharge. Furthermore, she contends that the constructive discharge was prompted by John Morrell's failure to respond to any of her complaints about harassment. While Canady contends that her complaints were ignored, she contends that John Morrell reacted swiftly to chastise or discipline her in response to periodic complaints about her conduct, even though her conduct was only in response to harassment.

In reply, John Morrell contends that no reasonable jury could find that Canady was constructively discharged, because Canady has failed to establish either that her working conditions were so intolerable that a reasonable person would have felt compelled to leave, or that she ever gave John Morrell a reasonable opportunity to remedy harassment, where her complaints gave no notice that she believed that the harassment was gender- or race-based. John Morrell points out that Canady quit less than a month after filing her administrative charge of harassment, which was the point at which John Morrell contends that Canady engaged in any protected activity, because only then did she allege Title VII violations.

#### 2. Canady's showing in support of her retaliation claim

As the Eighth Circuit Court of Appeals recently explained,

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, makes it unlawful for an employer to discriminate against an employee, for among other things, 'because [s]he has opposed any practice made an unlawful employment practice by this subchapter.'" *Buettner v. Arch Coal Sales Co.,* 216 F.3d 707, 713 (8th Cir.2000) (alteration in original) (quoting 42 U.S.C. § 2000e–3). Absent direct evidence of discrimination invoking the mixed-motive analysis of *Price Waterhouse,* the burden-shifting analy-

sis of *McDonnell Douglas* applies to claims of retaliation. *Buettner*, 216 F.3d at 713.

> To establish a prima facie case of retaliatory discrimination, a plaintiff must show: (1)[she] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action. *Id.* at 713–14 (citations omitted).

*Gagnon v. Sprint Corp.*, 284 F.3d 839, 849–50 (8th Cir.), *cert. denied*, —— U.S. ——, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002).

### a. Protected activity

■ As to the first element of Canady's *prima facie* case of retaliation, " '[p]rotected activities' under Title VII include much more than merely filing a formal charge of harassment." *Gagnon*, 284 F.3d at 854 n. 4. Instead, "protected activity" consists generally of "opposition" to " 'any practice made an unlawful employment practice by this subchapter.' " *Id.* at 849 (quoting *Buettner*, 216 F.3d at 713, in turn quoting 42 U.S.C. § 2000e–3). For essentially the same reasons that the court found, above, that Canady had generated genuine issues of material fact that she reported the harassment to John Morrell in such a way that John Morrell had notice that she was asserting that the harassment was based on sex or race, the court now concludes that there are genuine issues of material fact that Canady engaged in "protected activity" at the time of those reports, not just when she filed her administrative charge of discriminatory harassment.

### b. Adverse employment action

As to the second element, "adverse employment action," John Morrell does not dispute that a "constructive discharge" is an "adverse employment action" that would sustain a retaliation claim. Indeed, this court held in another case against John Morrell, *Baker v. John Morrell & Co.*, 220 F.Supp.2d 1000 (N.D.Iowa 2002), that a constructive discharge can constitute "adverse employment action" supporting a retaliation claim. *See Baker*, 220 F.Supp.2d at 1020. Rather, John Morrell contends that there is simply no genuine issue of material fact that Canady was *not* constructively discharged.

In *Baker*, this court also explained that, to establish that she was constructively discharged, "a plaintiff must show more than just a Title VII violation by her employer," and must, instead, show that the employer "deliberately render[ed] the employee's working conditions intolerable and thus force[d][her] to quit." *Id.* at 1022. The employer's intent to force the employee to quit is shown, in turn, by evidence that "quitting was a reasonably foreseeable consequence of the employer's discriminatory actions." *Id.* (internal citations omitted).

In the context of the record presented here, John Morrell's evidence that Canady did not quit until she had lined up other employment with Wells' Dairy and that she "did not miss a beat" between her employment with John Morrell and Wells' Dairy may be supportive of John Morrell's contentions that Canady was not constructively discharged, because it appears to undermine Canady's contentions that the workplace at John Morrell was "intolerable." However, such evidence does not render the question of "intolerability" beyond dispute, where Canady has pointed to harassment that she contends occurred almost daily and evidence that John Morrell failed to respond to such harassment, particularly when that evidence is also coupled with evidence that Canady, not her alleged harassers, was sometimes chastised or disciplined for her conduct in the course of incidents that she reported as harassment.

As this court explained in *Baker*, "'If an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge.'" *Baker*, 220 F.Supp.2d at 1023 (quoting *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 574 (8th Cir.1997)).

Finally, in the context of a contention that the employee was constructively discharged, it is true that "[t]he employee has an obligation to act reasonably by not assuming the worst and not jumping to conclusions too quickly." *See Baker*, 220 F.Supp.2d at 1022. However, because the court concluded, above, that Canady's filing of her administrative charge of discrimination was not the only "protected activity" on which her retaliation claim was based, the fact that Canady quit just a month after filing her administrative charge does not, as John Morrell contends, prove beyond dispute that Canady jumped to conclusions too quickly after filing her administrative charge for her to have been constructively discharged.

### c. Causal connection

Nor does Canady's quitting within a month of filing her administrative charge demonstrate beyond dispute the lack of causal connection between protected activity and any adverse employment action, the third element of Canady's retaliation claim. It is true that, "[i]n order to establish the third element of [her] prima facie case of retaliation, [Canady] needed to present evidence that [John Morrell] knew that [s]he had engaged in statutorily protected activity," and that, where the decision-makers who supposedly retaliated against the plaintiff were not aware of the allegedly protected activity, the plaintiff's purported retaliation claim fails for lack of a causal connection between the protected activity and the adverse action against the plaintiff. *Smith v. Riceland*, 151 F.3d 813, 818 (8th Cir.1998) ("We find that, based upon the evidence at trial, no reasonable jury

could have found that [the employer] knew that [the plaintiff's boyfriend] had helped [the plaintiff] in filing her charge of discrimination, and therefore, no reasonable jury could have found that a causal connection existed between [the boyfriend's] assistance of [the plaintiff] and his termination."). However, because there are genuine issues of material fact that Canady adequately reported sexual and racial harassment *when the harassment happened*, not just in her administrative charge, to put John Morrell on notice of actionable harassment, there are also genuine issues of material fact as to the causal connection between the protected activity of Canady's reports and the adverse employment action of a constructive discharge, because there is evidence that John Morrell knew of the protected activity of reporting harassment, but took no remedial action in response to those reports, which was, in part, the adverse employment action underlying the retaliation claim.

Because Canady has generated genuine issues of material fact on each of the challenged elements of her retaliation claim, John Morrell's motion for summary judgment on that claim will also be denied.

### III. CONCLUSION

The court concludes that Canady has generated genuine issues of material fact on each of the challenged elements of her claims of sexual and racial harassment and retaliation. Therefore, John Morrell's motion for summary judgment is **denied in its entirety.**

**IT IS SO ORDERED.**